Filed 8/13/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S076340 |
| v. | ) | |
| | ) | |
| LAM THANH NGUYEN, | ) | |
| | ) | Orange County |
| Defendant and Appellant. | ) | Super. Ct. No. 95WF0682 |
| _____ | ) | |

On January 28, 1999, defendant Lam Thanh Nguyen was sentenced to death for murdering Sang Duc Nguyen and Tuan Pham. This appeal is automatic. (Pen. Code, § 1239, subd. (b); further undesignated statutory references are to this code.) We strike the sentence enhancements under section 186.22, subdivision (b)(1) from the sentences imposed for actively participating in a gang in counts 3, 5, 7, 10, and 14. In all other respects, including the death sentence, we affirm the judgment.

## I. FACTS AND BACKGROUND

Defendant was charged in an amended information filed on May 4, 1998, in Orange County Superior Court with three counts of murder (§ 187, subd. (a)) with the special circumstance of multiple murder (§ 190.2, subd. (a)(3)), two counts of conspiracy to commit murder (§ 182, subd. (a)(1)), three counts of attempted premeditated murder (§§ 664, subd. (a), 187, subd. (a)), six counts of participating in a criminal street gang (§ 186.22, subd. (a)), possession of a controlled substance

(Health & Saf. Code, § 11350), and possession for sale of cocaine base (Health & Saf. Code, § 11351.5).  The amended information further alleged that defendant had inflicted great bodily injury on three of the surviving victims (former § 12022.7), had personally used a firearm in committing nearly all of the charged crimes (former § 12022.5, subd. (a)), and was vicariously armed with a firearm in committing one count of attempted murder (former § 12022, subd. (a)(1)).  The amended information alleged that all of the charged offenses were committed for the benefit of a criminal street gang.  (§ 186.22, subd. (b)(1).)

The trial court dismissed both counts of conspiracy to commit murder:  one count when the prosecution rested its case and the second count during the defense case.  The drug possession charges were severed for purposes of trial.  Defendant later pleaded guilty to possession of a controlled substance, and the other drug charge was dismissed.

Following the guilt phase of the trial, the jury on July 6, 1998 found defendant not guilty of one count of murder and the related count of participating in a criminal street gang.  The jury convicted defendant of the remaining charges and found true the remaining allegations.  The jury thus convicted defendant of murdering Sang Duc Nguyen and Tuan Pham, and found true the multiple-murder special-circumstance allegation.  Following the penalty phase of the trial, defendant was sentenced to death for the murders of Sang Duc Nguyen and Tuan Pham.  On the other charges, the trial court imposed but stayed three consecutive life sentences plus a determinate sentence of 15 years.

### A.    Guilt Phase

Six members of Vietnamese street gangs in Orange County, mostly members of the Cheap Boys, were shot during six separate incidents in 1994 and 1995; three of them died.  Defendant is a member of a rival gang called the Nip

Family. The prosecution sought to prove that defendant aided and abetted the first shooting and personally committed the other five. The defense contended that the Cheap Boys gang had framed him in order to remove him from the streets. He denied having been present at the first five shootings. Defendant admitted that he had been present at the sixth shooting, but denied that he had participated and claimed that if he did participate, the shooting had been in self-defense.

### 1. July 21, 1994, shooting of Tony Nguyen

In the afternoon of July 21, 1994, Tony Nguyen was giving some members of the Cheap Boys gang a ride home. Vinh Kevin Lac was in the front passenger seat of the car Tony was driving. Tinh Dam and his girlfriend, Chynna Vu, were in the back seat. Vu was a member of the Southside Scissors, a female Asian street gang. Several more members of the Cheap Boys gang were following in another car.

Tony stopped his car at a stop light on Garden Grove Boulevard, and another car stopped beside him to his left. He recognized the girl driving the car, later identified as My Tran, and saw a male, later identified as Nghia Phan, in the front passenger seat but could not see the people in the back because the windows "were kind of cloudy or dirty." Tony smiled at the girl driving the other car and then turned away because he "didn't want to stare." When the traffic signal turned green, he heard gunshots and "fell to the seat." Phan had fired four or five shots. Tony was shot in the neck and was paralyzed from the neck down.

At the scene of the crime, Lac, who had been in the front passenger seat of Tony's car, told the police that he could not identify anyone in the other car, but he thought they were members of the Nip Family because they were "enemies" of the Cheap Boys. A few days later, Lac realized that the male sitting in the back seat behind the shooter was defendant, who lived downstairs from him. Lac had

"bumped into" defendant five or six times prior to the shooting. Some days after the shooting, defendant came to Lac's apartment and asked, "What's up with the cops?" Lac assured defendant that he had said nothing to the police.

At trial, Lac identified defendant in court as the person in the other car who sat in the back seat behind the shooter. Lac also testified that just prior to the incident, the shooter's car passed Tony's car, and as it did so, defendant stared back at the occupants of Tony's car. The shooter's car went into a restaurant parking lot, waited for Tony's car to pass, and then pulled out to meet it at the stop light on Garden Grove Boulevard.

### 2. *November 24, 1994, shooting of Huy Nguyen*

On Thanksgiving, November 24, 1994, around 8:30 p.m., Huy Nguyen was shot multiple times, first outside and then inside a video game arcade called Mission Control in Garden Grove. He testified that he was standing outside the arcade when a "guy" approached him and asked if he was in the Tiny Rascals Gang. Huy said he only had friends in the gang. He added that the "guy" "thought that I belonged to T.R. [Tiny Rascals Gang], and then he hit me on the face one time." Huy claimed that he remembered little of what happened after he was punched, but he testified that he heard gunshots and ran into Mission Control. He saw blood all over his body, found he was unable to move, and then lost consciousness. Huy is now partially paralyzed. He cannot walk but has regained some movement of his arms. He could not remember much about the shooting and could not identify the person who shot him.

Channthai "Cindy" Pin testified that she had gone outside of Mission Control with two friends to smoke a cigarette. She heard Huy, who was associated with the Tiny Rascals Gang, start to yell at someone in Vietnamese. Pin had seen that person the day before at a motel nearby. He had displayed a gun. Huy

4

approached the person and punched him in the face. The person punched Huy back, and several of Huy's friends joined the fight. Huy pushed the person up against a pillar. The person fell to the ground, and Huy's friends began kicking him and punching him. He tried to get up and then pulled a gun out of his waistband and shot Huy in the stomach. Huy stumbled into Mission Control, and the shooter followed him in. Pin then heard more shots fired inside Mission Control. Other witnesses inside Mission Control testified that Huy was shot several times as he lay on the floor. Before trial, Pin had identified defendant as the person who shot Huy, but she did not identify defendant in court.

Although there were many witnesses, few were able to identify the shooter. Chamroeun Choeun was smoking a cigarette outside Mission Control with her friends Pin and Chris Nguyen when she noticed Huy arguing with someone in Vietnamese. The two men starting fighting, and other people tried to stop the fight. Choeun then heard a gunshot and turned and saw defendant fire a gun twice. She ran.

*3. February 5, 1995, murder of Sang Nguyen*

On February 5, 1995, Cheap Boys gang member Sang Nguyen was shot and killed outside of the Dong Khanh restaurant in Westminster. Trieu Binh Nguyen, a fellow member of the Cheap Boys, who was visiting from Texas to celebrate the Vietnamese New Year, had gone to dinner at the restaurant with the victim and several other people, including his girlfriend Bich To, Binh Tran, and Linda Vu. Trieu and Tran went outside so Trieu could smoke a cigarette.

Vu looked through the front window of the restaurant and saw defendant, whom she recognized as belonging to the Nip Family. She told the victim, "I thought I saw N.F. [Nip Family] outside." Sang asked where Tran was, and Vu said he was outside smoking. The victim went outside and met defendant. They

5

shook hands, and defendant "grabbed his head" and shot the victim.  Vu grabbed her one-year-old daughter and ducked under the table.  Vu later identified defendant in a photographic line up, at the preliminary hearing, and at trial.

Trieu saw defendant and two other members of the Nip Family walk quickly toward the restaurant.  Defendant was carrying a gun.  Sang was leaving the restaurant and approached defendant and his companions.  Trieu heard a gunshot and saw Sang grab his stomach and fall to the ground.  Defendant then shot the victim in the head and ran away.

Trieu acknowledged he had told the police at the scene of the crime that he had not witnessed the murder because he had been in the bathroom.  He explained that in the gang subculture, a person who talks to the police may be beaten or killed.  Later, he called the police because he could no longer tolerate that defendant had gotten away with killing his friend.

At the scene of the crime, Vu also had told the police that Trieu had been in the bathroom when the crime occurred.  She explained that people in the gang subculture are not supposed to talk to the police, saying that you are "a rat" if you do and rats "sometimes . . . get hurt."

Martin Hall was standing by a public telephone outside the restaurant doors when he heard a gunshot and saw the victim fall on his face.  The shooter then "stepped over him and held a gun down and then made a comment and shot him again."  Hall could not hear the whole comment but described it as "something-something mother fucker."  The shooter then "just stood up and casually walked down the short steps into the parking lot" and walked away.  Hall failed to identify defendant in a subsequent photo lineup and did not identify defendant as the shooter at trial.

#### 4. *March 11, 1995, shooting of Khoi Huynh*

On March 11, 1995, Cheap Boys member Khoi Huynh was shot outside of the Rack and Cue pool hall in Stanton. Huynh had been playing pool with Huu Tran and other friends. He left and was on his way to his car when he saw "a few guys standing outside" and was shot. He ran and his assailants pursued him, continuing to shoot until someone helped him into a liquor store. He was shot seven times.

At his home 10 days later, Huynh told a sheriff's department investigator that defendant had shot him. He and defendant had been friends at one time. Huynh told the investigator that he could not testify because he was a gang member. The next day, Huynh picked defendant's photo out of a photo lineup.

Jeremy Lenart was in the Rack and Cue pool hall at about 9:30 p.m. when he heard a gunshot outside, followed by "probably 30 or 40" more shots. It sounded like different weapons were being fired. Lenart saw three different guns being fired outside and another one inside the pool hall. Lenart saw defendant shoot one victim, who was unarmed, and chase that victim as he ran, firing additional shots. Several other persons also shot at the victim as he ran. Lenart identified defendant in court as the person who shot and chased the victim.

David Arnold had just parked his truck in front of a liquor store around the corner from the Rack and Cue when he "heard a bunch of gunshots ring out." There were "25 to 30" gunshots that seemed to be coming from the pool hall around the corner. He ran toward the liquor store but saw a man run from the vicinity of the pool hall and collapse in the parking lot. Arnold could see that the collapsed man had been shot and pulled him into the liquor store. Arnold pulled the victim behind the counter and used paper towels to try to stop the bleeding. The victim was unarmed.

*5. May 3, 1995, murder of Duy Vu*

Defendant was found not guilty of the murder of Duy Vu, who was shot and killed at a laundromat in Westminster on May 3, 1995.

*6. May 6, 1995, murder of Tuan Pham*

On May 6, 1995, Tuan Pham, a member of the Cheap Boys, was murdered at the corner of Brookhurst Street and Westminster Boulevard in Garden Grove. Shortly before 9 p.m. that evening, Robert Wayne Murray and his girlfriend were on their way to dinner. He stopped his van for a red light in the left turn lane on Brookhurst at the intersection with Westminster. Pham, who was driving the car behind him, got out of the vehicle, spun around, got back in the car and backed up quickly, almost colliding with another car. Pham got out of the car again, holding a gun, and approached a white Honda in the lane next to Murray's van. Defendant sometimes drove a white Honda. As Pham approached the Honda, Murray saw that the driver of the Honda was holding a gun to his chest. As Pham approached the Honda, the driver of the Honda reached out and fired three shots at him. A passenger in the Honda also opened fire, and Pham fired back. A person standing to the rear of the Honda fired a shotgun at the Honda. As Murray drove away, going the wrong way on Brookhurst Street and driving over the curb into a parking lot, he heard multiple shots and then a blast from a shotgun. As many as 12 shots had been fired. Murray later found two bullet holes in his van. When the shooting stopped, the white Honda drove slowly from the intersection, swerving from side to side. The rear window had been shot out.

Pham lay dead in the intersection; he had been shot twice in the back and once in the head. Police found a "pistol grip shotgun" and a handgun "stashed inside of some of the bushes" nearby.

Murray later picked out defendant's photograph from a photo lineup as someone who looked "close" to the driver of the white Honda, but Murray said he

could not "make any identification." Murray testified at trial that he did not think he would recognize the driver of the white Honda if he saw him again.

### 7. Subsequent investigation

On May 23, 1995, at 6:48 p.m., Garden Grove Police Officer Mike Smith went to 13401 Amarillo Drive in Westminster. He saw three men enter a silver Ford Escort and drive away. Two of the men later were identified as members of the Nip Family. When police pulled over the silver Escort, an Asian male in the front passenger seat, who was roughly the same height as defendant, ran away.

A police dog located a Colt .380-caliber revolver in some bushes near where the fleeing passenger was last seen. The fact that the police dog reacted to the gun meant that a person had recently held it. Ballistics tests showed that the Colt pistol had fired a bullet recovered from the car Tuan Pham had been driving when he was killed.

On that same day, police obtained a warrant and searched the house at 13401 Amarillo Drive. It was a five-bedroom house rented by Tam Nguyen, who occupied one bedroom and rented out the other four bedrooms to between eight and 10 people. Police found two .357-caliber pistols, a rifle similar to an AK-47, and prescriptions from Dr. Dinh Van Dinh for ampicillin for Huy Pham and for cephalexin for "John Nguyen."

Dr. Dinh Van Dinh testified at trial that he had treated defendant, who used the name John Nguyen, on May 11, 1995, for wounds to his hand and arm. Defendant had said he had been cleaning his shotgun five days earlier and a friend had accidently discharged it. Dr. Dinh had prescribed the antibiotic Cephalexin to prevent infection.

On May 25, 1995, Westminster Police Detective Mark Nye arrested defendant when he arrived for a medical appointment with Dr. Dinh. Defendant

9

had injuries to his left hand and right elbow consistent with wounds caused by a shotgun.

Defendant testified in his own defense that he was in Alabama when Tony Nguyen and Huy Nguyen were shot. His sisters Phuong and Nen Nguyen corroborated his testimony. Defendant denied having been present when Sang Nguyen and Duy Vu were killed or when Khoi Huynh was shot. Defendant admitted having been in the white Honda when Tuan Pham was killed, but said he was unarmed and sitting in the back seat.

## B. Penalty Phase

The parties stipulated that defendant had been convicted of assault with a firearm in violation of section 245, subdivision (a)(2). Cai Thi Tran, the mother of murder victim Sang Nguyen, testified that her son was a "good kid" who "liked to draw pictures." She described the impact of her son's death on her and her family.

Defendant's sister, Nen Nguyen, testified for the defense that when defendant was six years old, she and her siblings fled Vietnam and traveled to Thailand on a fishing boat. After being held by Thai police for 20 days and spending two months in a refugee camp, they came to the United States.

Psychologist Francis Crinella interviewed defendant, administered psychological tests, and determined that defendant was intelligent and showed no signs of brain damage. He was "somewhat compromised in his use of the English language" and had the math skills of an eighth grader.

## II. GUILT PHASE ISSUES

### A. Issues Related to the February 5, 1995, Murder of Sang Nguyen

#### 1. Expert testimony

Over defendant's objection, the trial court permitted the prosecution's gang expert to testify that the most common excuse given by reluctant witnesses at the

scene of a gang crime committed in a restaurant is that they did not see anything because they were in the bathroom. Defendant argues that the convictions related to the murder of Sang Nguyen must be reversed because this violated Evidence Code sections 801 and 352 as well as his federal constitutional rights to due process, confrontation of witnesses, trial by an unbiased jury, and freedom from cruel and unusual punishment.

Sang Nguyen, a member of the Cheap Boys gang, was shot and killed on February 5, 1995 outside of the Dong Khanh Restaurant in Westminster where he was having dinner with five companions: Linda Vu, Trieu Binh Nguyen, Trieu Hai Nguyen, Binh Tran, Bich To, and Amy Pech.

When Westminster Detective Mark Nye arrived at the scene shortly after the shooting, all five dinner companions denied having witnessed the shooting. Two of them said they were in the bathroom when it happened. Trieu Binh Nguyen, a member of the Cheap Boys, told Detective Nye he was returning to the table from the restaurant's bathroom when he heard two shots, but that he did not see who shot Sang. Linda Vu, a member of a female gang associated with the Cheap Boys, confirmed that Trieu Binh Nguyen and Binh Tran were both in the bathroom when she heard gunshots, as did Bich To and Amy Pech. Vu denied having seen the shooting or the shooter.

Two months after the shooting, Detective Nye received a telephone call from Trieu Binh Nguyen and Khoi Huynh, a "core member" and "shot-caller" of the Cheap Boys gang. Khoi Huynh was a victim of the shooting on March 11, 1995. During the three-way telephone call, Trieu Binh Nguyen told Detective Nye he had seen defendant and two other men walk into the restaurant. Defendant hit Sang on the shoulder and asked him to go outside, where he shot him.

On August 23, about three months after Trieu Binh Nguyen called Detective Nye, Linda Vu changed her story in a tape-recorded interview with

11

Detective Nye and another detective. She said that before the shooting, she had seen a man peering through the window and recognized him from prior encounters. She then saw Sang walk outside, "struggle" with the man, and then heard the gunshot. During the interview, Vu picked out defendant's photograph from a photo lineup as the man who had looked through the window and later shot Sang.

At trial, all of the dinner companions, except for Amy Pech, retracted their initial statements about what happened the night of the shooting. Trieu Binh Nguyen testified that he had lied about being in the bathroom and that he actually had gone outside to smoke with Binh Tran. While he was outside the restaurant, he saw defendant, accompanied by two other men, shoot Sang in the head. Trieu Binh Nguyen explained that he had lied on the night of the shooting because he had been "confused," "depressed," and "frustrated." Linda Vu also identified defendant as the shooter.

The prosecution called Detective Nye as an expert witness on Asian gangs. Detective Nye testified that he had "been a police officer for Westminster for over 12 years," during which time he had "made contact with several hundred or probably close to a thousand gang members." He had "over 300 hours advanced officer training in gangs, with particular emphasis on Vietnamese or Asian street gangs." Among other matters, Detective Nye testified that a gang member who talks to the police is considered a "rat" and may be "severely beaten, if not killed."

On cross-examination, Detective Nye testified that Trieu Binh Nguyen told him on the night of the crime that he had been returning from the bathroom when he heard the gunshots and did not witness the murder. Linda Vu confirmed that Trieu Binh Nguyen and Binh Tran had been in the bathroom when the murder occurred. Vu said she had ducked under the table when she heard the gunshots and also did not see the shooting.

12

On redirect examination, over defendant's objection, the prosecutor asked Detective Nye, based on his background, training, and experience, to name the "one common thing that people seem to say when they don't want to cooperate with you . . . when you go to . . . a crime scene where a gang crime is involved, like a shooting or a homicide." Detective Nye answered, "Usually say they didn't see anything." The prosecutor then asked what is "the most common excuse of [why] they didn't see anything." Detective Nye answered, "In my experience with investigating gang crimes in the cafes and restaurants, the number one answer is 'I was in the bathroom at the time.' "

Defendant claims Detective Nye's testimony "was outside the scope of permissible expert testimony." Although Detective Nye was qualified as a gang expert, the disputed testimony was based upon his personal observations at numerous gang-related crime scenes, not his expert opinion, and it thus is admissible if it is relevant. (*People v. Champion* (1995) 9 Cal.4th 879, 921–922, overruled on another ground in *People v. Combs* (2004) 34 Cal.4th 821, 860.) Detective Nye's testimony about the most common excuse given by reluctant witnesses at the scene of a gang-related crime is relevant because the jury could infer from it that the witnesses in this case were reluctant to testify and initially fabricated the story that they did not witness the murder. (See Evid. Code, § 210 [" 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."].)

Defendant argues that Detective Nye's testimony was inadmissible because it "was premised upon two implicit propositions": that persons at the scene of a gang-related crime who claimed to be in the bathroom were lying and that they were lying because they did not want to cooperate with the police. According to

13

defendant, these two propositions are problematic because "each involved an untenable claim of the ability to assess credibility and/or to read minds, . . . neither involved matters 'perceived by or personally known . . . or made known to him at or before [his testimony],' " and both were "too unreliable . . . as the basis for an expert opinion." But Detective Nye's statements described the common behavior of witnesses to gang-related crimes and did not purport to assess the veracity of individual witnesses. Detective Nye stated that in his experience, witnesses at a gang-related shooting in a public place such as a restaurant often claim that they did not see anything because they had been in the bathroom.

Even if we were to construe Detective Nye's testimony as expert opinion, defendant's argument lacks merit. Under Evidence Code section 801, subdivision (a), an expert may offer an opinion "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." In *People v. Gonzalez* (2006) 38 Cal.4th 932, a police gang expert testified that witnesses to a gang-related crime are usually reluctant to testify because of fear of retaliation, and that is why "the witnesses might repudiate earlier truthful statements" that the defendant was the shooter. (*Id.* at p. 946.) We held that this testimony "was quite typical of the kind of expert testimony regarding gang culture and psychology that a court has discretion to admit." (*Id.* at p. 945.) "Whether members of a street gang would intimidate persons who testify against a member of that or a rival gang is sufficiently beyond common experience that a court could reasonably believe expert opinion would assist the jury." (*Ibid.*; see *People v. Ward* (2005) 36 Cal.4th 186, 211 [police officer permitted to testify that "witnesses, even those from rival gangs, are often reluctant to identify or testify against gang members out of fear for their safety"].) The trial court here would not have abused its discretion if it had concluded that

14

the bathroom excuse used by witnesses to gang-related shootings was sufficiently beyond common experience to allow admission under Evidence Code section 801.

Defendant further argues that Detective Nye's testimony was inadmissible under Evidence Code 352 because "any probative value" of the evidence "was vastly outweighed by its undue prejudicial effect." Such claims are reviewed on appeal for abuse of discretion. (*People v. Bryant, Smith, and Wheeler* (2014) 60 Cal.4th 335, 408.) This claim fails because defendant does not show any prejudice within the meaning of section 352. "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) Detective Nye's testimony that reluctant witnesses at the scene of a gang crime committed in a restaurant commonly claim they did not see anything because they were in the bathroom had no tendency to evoke an emotional bias against defendant.

Finally, even if the trial court had erred in admitting Detective Nye's testimony, the error would have been harmless. All witnesses but Amy Pech retracted their initial statements about having been in the bathroom, and both Trieu Binh Nguyen and Linda Vu identified defendant as the person who shot Sang Nguyen.

## 2. *Evidentiary rulings and limiting instruction*

Defendant challenges several of the trial court's evidentiary rulings, as well as its refusal to give the jury a limiting instruction pursuant to Evidence Code section 355. He contends that these errors violated his federal constitutional rights to due process, to present a defense, to compel the testimony of witnesses, and to be confronted with the witnesses against him.

First, defendant argues that the trial court erred in sustaining an objection to a question defense counsel asked defense witness Tin Duc Phan because it hindered defendant's efforts to establish the existence of a plan to frame him for the murder of Sang Nguyen. At the beginning of the morning session on June 16, 1998, defense counsel predicted that he would finish the defense case the following day by calling several witnesses. Near the end of the defense case that same day, defense counsel announced outside the presence of the jury that he would call as a witness Tin Duc Phan. The prosecutor complained that defense counsel had promised to provide "reports 48 hours before calling a witness," but she had received only the day before a report of a defense interview of Phan that had taken place on September 19, 1997. In the hallway a few minutes earlier, the prosecutor had shown Phan that report, and he denied making a quote attributed to him that "the Cheap Boys are setting up Nip Family because it's okay to rat on them since they are ratting on us." Phan told the prosecutor that the Cheap Boys "wouldn't lie to set somebody up." Defense counsel stated that he needed some time to decide whether to call Phan as a witness "in view of the prosecution's recent interview."

Defense counsel later decided to call Phan as a witness after the court ruled that a misdemeanor charge pending against Phan could not be used to impeach him. At the bench, the prosecutor said she understood that defense counsel was only "going to cover that paragraph we talked about." Defense counsel agreed.

16

Phan then testified that he had been a member of the Cheap Boys from 1991 to 1995. Phan agreed that he had been interviewed by a defense investigator on September 19, 1997, but said he did not "remember what we talked about." Defense counsel then asked Phan whether he had made several statements attributed to him in the defense investigator's report, including whether he had told the investigator "that the Cheap Boys were setting up Nip Family because it's okay to rat on them, since they're ratting on us?" To each question, Phan answered, "I don't remember."

Defense counsel then asked whether Phan knew an individual named Lap Nguyen. Phan said he did. When defense counsel asked Phan whether he knew that Lap Nguyen "was accused of shooting," the prosecutor objected and said at the bench: "I could have sworn that's why we approached and he said he specifically was only going to the paragraph." Defense counsel replied: "I told you I wasn't going to ask that. This is Lap Nguyen, this is the guy that pisses him off because this is this Cheap Boy, and Ky Nguyen Nip Family is ratting on Cheap Boy in a separate incident. Setting off this war." The court sustained the prosecutor's objection.

After Phan finished his testimony and the jury had been excused for the morning, the court explained that defense counsel had exceeded the scope of questioning that the parties had agreed to and "sought to get into an area that the district attorney had an objection to," but offered that if defense counsel "still want[s] to get into it, we can talk about it." Defense counsel explained that his understanding of what started "this ratting retaliation war" is that Nip Family member Ky Nguyen testified in 1995 that Cheap Boys member Lap Nguyen shot him. Defense counsel "wanted to explore and see if" Phan knew that Lap Nguyen had been accused of attempted murder. Defense counsel acknowledged that his investigator had not asked Phan this question, so he did not know what Phan's

17

answer might be. The court responded that it did not "mind you pursuing that theory" but noted that Phan had been interviewed on September 19, 1997, which had given defense counsel "adequate time to explore all the parameters that this witness can give to you. And if you don't have it in a statement that you've given to opposing counsel during your interviews, I'm not going to permit counsel to pursue that. Especially when you don't know what the answer is going to be."

Defendant argues that the trial court erroneously concluded "that the defense had failed in its discovery obligations" and then "compounded its error by using preclusion of testimony as the sanction." This does not accurately describe the trial court's ruling. The trial court did not impose a discovery sanction. Rather, the trial court sustained an objection to a question asked by defense counsel.

Defendant cites *People v. Zambrano* (2007) 41 Cal.4th 1082, 1163, which held that the prosecution "need not extract all possible information from a private citizen who is a potential prosecution witness in order to disclose it to the defense." But here, the trial court did not fault defendant for failing to determine whether Phan knew that Lap Nguyen had been accused of attempted murder. The trial court held that defendant could not ask Phan this question for the first time on the witness stand without first interviewing him on this subject and providing a report of this interview to the prosecutor.

"The court shall exercise reasonable control over the mode of interrogation of a witness" (Evid. Code, § 765, subd. (a)) and need not permit examination of a witness that amounts to nothing more than a fishing expedition (*Schreefel v. Okuly* (1983) 143 Cal.App.3d 818, 828). A defense investigator had interviewed Phan nine months earlier but did not ask him whether he knew that Lap Nguyen had been accused of attempted murder. The trial court did not abuse its discretion in declining to permit defense counsel to ask the witness that question for the first

18

time at trial, which would have had the effect of circumventing the parties' agreement that defense counsel would give the prosecutor advance notice of the evidence he planned to present.  In any event, defendant cannot demonstrate prejudice resulting from the court's ruling because the record before us does not reflect how the witness would have answered the question.

Defendant next argues that the trial court erred in excluding evidence of a meeting place or "crash pad" used by the Cheap Boys because such evidence would have supported the "defense theory . . . that it would have been at such a meeting that an agreement was reached to falsely point the finger at [defendant]." Defendant acknowledges that he "was allowed to elicit the generic definition of 'crash pads' " but contends he was not allowed to show that the Cheap Boys themselves had such a crash pad or that Linda Vu, Kevin Lac, and Khoi Huynh themselves frequented the Cheap Boy's crash pad.  But the record belies defendant's assertion that the court erroneously precluded him from introducing evidence that the Cheap Boys used a crash pad as a meeting place.  As explained below, each of the trial court's evidentiary rulings was proper.

On May 27, 1997, Cheap Boys member Khoi Huynh, who was shot outside of the Rack and Cue pool hall on March 11, 1995, testified on cross-examination that he had been contacted by the police on May 14, 1992 outside of the Mission Control video arcade.  When defense counsel asked whether Huynh had been violating the terms of his probation, the prosecutor objected on the ground, among others, that the question violated the rule in *People v. Wheeler* (1992) 4 Cal.4th 284, 295–297, limiting the use of prior misdemeanor convictions for impeachment.  The court asked to speak to counsel outside the presence of the jury.

Defense counsel explained that he was not attempting to impeach Huynh by showing he was on probation but rather was trying to show that Huynh hatched a

19

plan to frame defendant for the charged crimes: "Khoi's high up in the Cheap Boys hierarchy. . . . And my whole theory about this case is none of the accusations arise against Lam Nguyen until after this March 11, 1995, shooting of Khoi Huynh goes down. And our theory is that he's the mastermind behind this, talking with other people and getting a campaign going of liars who are going to come in and wrongfully accuse our guy of some of these murders that took place on May 3 and on May 6."

The court was not convinced: "Trying to prove a probation violation is not admissible under *Wheeler* or the cases that follow from that. So I'm concerned that that's what, in fact, you're trying to do, although the law does not permit it." Defendant acquiesced: "If the court's concerned about the probation violation, I won't get into the fact that he is in the area with known Cheap Boys, and I won't refer to it as a probation violation if that's a concern by the court."

Later the same day, before the jury was called in, defense counsel mentioned "a crash pad up in El Monte." The court replied: "What you have just identified might be permissible areas. I can't make a definitive decision at this stage. I'll simply ask you don't go into this area. This is something that we need to have some time to discuss . . . ."

The next day, defense counsel again mentioned the crash pad evidence but did not press the court for a ruling: "Your Honor, I don't know whether you want to wrestle with the issue now, I know you put this on the back burner with Khoi Huynh, but it's the same El Monte crash pad on January 29, 1995, six days before the shooting. . . . So I know you put it on the back burner with Khoi. If you want me to continue putting it on the back burner?" The court replied: "Keep it on the back burner."

The court denied defendant's offer of proof at the beginning of the afternoon session on June 8, 1998 but promised to "revisit this area once again

before making any final rulings." Defendant had offered to prove that on January 29, 1995, six days before Sang Nguyen was murdered, the El Monte police department raided a Cheap Boys crash pad and found Khoi Huynh and Linda Vu with a "whole bunch of Cheap Boys gang members" and "two loaded .357 magnums." Defendant asserted this evidence was relevant because the crash pad is "where a bunch of Cheap Boys get together and discuss gang politics and who their next target is going to be and things like that." The court asked whether defendant had "evidence of statements that were made between these individuals on January 29th, '95." Defendant answered "no," and the court excluded the evidence, adding: "As things develop during the course of presenting your defense, we'll revisit this area once again before making any final rulings."

Detective Nye testified on cross-examination that a crash pad is "where the gang members congregate, plan criminal activity, hide out fugitives and other wanted persons, runaways, hold or stash weapons and other evidence from crimes." Defense counsel then asked to approach the bench, and the court reiterated that its previous ruling excluding evidence of "the thing in Pasadena in January of '95 . . . still holds and subject to review later during the presentation of your case."

The court later revisited the issue of the El Monte crash pad:

"The Court: The subject of the El Monte crash pad in January of '95 keeps coming up, and every time I visit it I always make the same ruling, but, I might be missing something. So, the best I can make out from your offer of proof is, the troops from the opposing gang got together and they're at a crash pad and they're doing things similar to what Nye testified gangs do at crash pads. But, you want to take it one step further that somehow or another they got together and came up with, I guess their identification of your client?

21

"[Defense Counsel]: Well, they discussed gang politics and what's going on. That's out before the jury. And, you know, I don't know when this Cheap Boy conspiracy was hatched between the Khoi Huynh's, Kevin Lac's and the Linda Vu's, but at some point in time at some crash pad, somewhere."

Defense co-counsel added that the beginning of the Cheap Boys conspiracy "could very well have happened there in El Monte." The court ruled: "Okay. I just wanted to hear one more time. It doesn't change my ruling . . . ."

Near the end of the defense case, defense counsel checked whether the trial court had made a "definitive ruling" on admitting evidence of the January 1995 raid on the crash pad in El Monte. The court confirmed that it had, saying: "My instincts were well taken."

Defendant argues that the trial court erred in excluding evidence of the January 1995 raid on the Cheap Boys crash pad because it was relevant to show that the Cheap Boys actually had a crash pad and that Khoi Huynh and Linda Vu had been there at the same time. This evidence was marginally relevant at best. The raid on the El Monte crash pad occurred well before the Cheap Boys allegedly began the conspiracy to frame defendant. The trial court did not abuse its discretion in excluding this evidence on the ground that it would necessitate undue consumption of time and would confuse the issues in a manner that outweighed its limited probative value. (Evid. Code, § 352.)

Defendant next argues that the trial court erred in excluding impeachment evidence that Bich To was living with Trieu Binh Nguyen when she recanted her statement to police at the crime scene that Trieu Binh Nguyen, her boyfriend at the time, had been in the bathroom when Sang was shot. To was called as a witness for the defense and testified that she and Trieu Binh Nguyen had been visiting from Texas. To testified that she had lied when she told police at the scene of the crime that he and Binh Tran were in the bathroom when Sang was shot. She said

she feared that had she told the truth that night, the police might have prevented Trieu Binh Nguyen from returning to Texas.

To testified that a few weeks earlier, she had spoken to the prosecutor on the telephone and explained that her statement to the police was false. Before talking to the prosecutor, To had spoken to Trieu Binh Nguyen but had not discussed her testimony. To confirmed that after the murder, she remained Trieu Binh Nguyen's girlfriend "for a period of time" but denied that she saw him on a regular basis and could not recall how often she saw him. She denied ever having discussed the change in her testimony with Trieu Binh Nguyen.

Defense counsel asked to approach the bench and explained that he understood that To and Trieu Binh Nguyen had had a child together and wanted to ask To whether that was true in order to impeach her testimony that she had not seen Trieu Binh Nguyen regularly after the murder. The prosecutor said she did not believe that was true. At a hearing held outside the presence of the jury, To denied having had a child with Trieu Binh Nguyen. The jury was brought back into court, but before questioning resumed, defense counsel asked to approach the bench again and the following exchange took place:

"[Defense Counsel]: If they were living at the same address?

"The Court: No.

"[Defense Counsel]: Well, judge —

"The Court: The answer is no.

"[Defense Counsel]: You won."

After To was excused, defense counsel again asked to approach the bench and said he had been told by the prosecutor that To and Trieu Binh Nguyen had been married. To was recalled as a witness and confirmed that she had been married to Trieu Binh Nguyen for seven or eight months the year before. During that period, she saw him on a daily basis.

23

Defendant argues that the trial court erred in refusing to permit defense counsel to ask To whether she had been living at the same address as Trieu Binh Nguyen. But any possible prejudice from not permitting defense counsel to ask this question was cured when, immediately thereafter, defense counsel was permitted to have the witness testify that she had been married to Trieu Binh Nguyen for several months in 1997.

Defendant challenges the trial court's refusal to instruct the jury that Trieu Binh Nguyen's testimony that he decided to testify against defendant because he had heard that "the same guy killed my friend" was introduced for the nonhearsay purpose of showing Trieu Binh Nguyen's state of mind and not for the truth of the matter asserted.

As noted, Trieu Binh Nguyen had told police at the scene of Sang's murder that he had been in the bathroom and had not witnessed the shooting. Later, he called the police and said he had seen defendant shoot and kill Sang. When asked by the prosecutor at trial why he had done this, he explained: "It get to a point that I heard lot of my friend went down from what happened, the same guy killed my friend, get to a certain point I can't stand it anymore." Defense counsel objected: "Objection, unless the court instructs that that's not coming in for the truth of the matter asserted therein. Other than that I'm objecting because it's based on impermissible hearsay." The trial court overruled the objection.

The trial court was correct to admit the statement because it went to Trieu Binh Nguyen's state of mind. (See *People v. Mendoza* (2007) 42 Cal.4th 686, 697.) Evidence Code section 355 states that "[w]hen evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly." But even assuming the trial court erred in failing to give a limiting instruction, the error did not prejudice defendant because the purpose of eliciting Trieu Binh

24

Nguyen's statement was clear from the prosecutor's question. The prosecutor asked why Trieu Binh Nguyen had decided to testify against defendant, not what Trieu Binh Nguyen knew about other crimes with which defendant was charged. Trieu Binh Nguyen's statement "the same guy killed my friend" could not have had much weight in light of the other evidence at trial, and there is no reasonable probability that the court's refusal to instruct affected the outcome of the trial.

### B. Issues Related to the May 6, 1995, Murder of Tuan Pham

#### 1. *Self-defense*

Defendant argues that the convictions arising out of the murder of Tuan Pham and the resulting judgment of death must be reversed because the evidence established self-defense as a matter of law. Defendant claims that "there is no legal support for the jury's verdicts . . . and the convictions must be reversed for insufficiency of evidence as a matter of Due Process under the Fifth and Fourteenth Amendments."

As noted, Pham, a member of the Cheap Boys, was killed when he approached a white Honda that was stopped at a red light. As defendant concedes, the jury accepted the prosecution's evidence that defendant "was seated in the driver's seat of the Honda Accord and fired one or more of the shots that killed Tuan." Robert Murray, the driver of the car next to defendant's, saw Pham approach carrying a gun. Murray testified that just before Pham arrived at the driver's window of the Honda, the driver pulled out a gun and then "looked over at me . . . and gave a nice smile, and put [the] gun right here to his chest." It looked to Murray as if the people in the Honda knew that Pham was approaching: "[T]hey must have known something was going to come down, because they started to kind of move about, you know, nervousness or whatever you would want to call it." Murray surmised that the driver was "waiting for the move." The

driver then pointed the gun at Pham and fired, and Pham fired back. Murray drove off. Pham lay dead in the intersection; he had been shot twice in the back and once in the head.

The court instructed the jury at length on self-defense: "The killing of another person in self-defense is justifiable and not unlawful when the person who does the killing actually and reasonably believes, one, that there was an imminent danger that the other person will either kill him or cause him great bodily injury; and, two, that it is necessary under the circumstances for him to use in self-defense force or means that might cause the death of the other person for the purpose of avoiding death or great bodily injury to himself. [¶] . . . To justify taking the life [of] another in self-defense the circumstances must be such as would excite the fears of a reasonable person placed in a similar position, and the party killing must act under the influence of those fears alone."

"A person threatened with an attack that justifies the exercise of the right of self-defense need not retreat. . . . [A] person may stand his ground and defend himself by the use of all force and means which would appear to be necessary to a reasonable person in a similar situation . . . . This law applies even though the assailed person might more easily have gained safety by flight or by withdrawing from the scene."

"The right of self-defense is only available to a person who initiated an assault if he has done all of the following: One, he has actually tried in good faith to refuse to continue fighting; two, he has clearly informed his opponent that he wants to stop fighting; and, three, he has clearly informed his opponent that he has stopped fighting."

"The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense."

26

"The right of self-defense is only available to a person who engages in mutual combat if he has done all of the following: One, he has actually tried in good faith to refuse to continue fighting; two, he has clearly informed his opponent that he wants to stop fighting; three, he has clearly informed his opponent that he has stopped fighting; and, four, he had given his opponent the opportunity to stop fighting."

Defendant is incorrect that the evidence established self-defense as a matter of law. " '[W]here the evidence is uncontroverted and establishes all of the elements for a finding of self-defense it may be held as a matter of law that the killing was justified; however, where some of the evidence tends to show a situation in which a killing may not be justified then the issue is a question of fact for the jury to determine.' " (*People v. Levitt* (1984) 156 Cal.App.3d 500, 509 (*Levitt*).) The jury in this case could reasonably have concluded, based on the evidence, that defendant was engaged in mutual combat because the Nip Family, of which he was a member, was engaged in an ongoing gang war with the Cheap Boys, of which Pham was a member.

"[A]s used in this state's law of self-defense, 'mutual combat' means not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities. . . .* In other words, it is not merely the *combat*, but the *preexisting intention to engage in it*, that must be mutual." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1045 (*Ross*).) In light of Detective Nye's testimony regarding the state of war that existed between the Nip Family and Cheap Boys during the period in question, the jury could reasonably have concluded that these rival gangs had a preexisting intention to engage in hostilities whenever the opportunity presented itself.

The jury also reasonably could have concluded that defendant was not entitled to claim self-defense because, in shooting Pham, he did not act on the

27

basis of fear alone but also on a desire to kill his rival. Section 197, subdivision 1 states that homicide is justifiable "[w]hen resisting any attempt to murder any person . . . ." Section 197, subdivision 2 adds that homicide is justifiable "[w]hen committed in defense of . . . person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony . . . ." "A 'bare fear' " (§ 198) that a felony will be committed "by violence or surprise" (§ 197, subd. 2) is not sufficient to justify homicide; rather, "the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone" (§ 198).

Several decisions have interpreted the phrase "such fears alone" in section 198. *People v. Trevino* (1988) 200 Cal.App.3d 874 (*Trevino*) held that "an instruction which states that the party killing must act under the influence of such fears alone, is a correct statement of the law." (*Id.* at p. 879; accord, *People v. Ye Park* (1882) 62 Cal. 204, 207–208.) *People v. Shade* (1986) 185 Cal.App.3d 711 held that under section 198, "self-defense is not available when a person does not act out of fear alone, but out of fear and a desire to harm the attacker." (*Shade,* at p. 716.) Similarly, the Court of Appeal in *Levitt* held that "a reasonable trier could have found that, even assuming defendant had the right to use some force in self-defense, he was less than candid regarding the degree of danger he actually faced, and his response was attributable more to a preconceived intent to kill than to the actual danger." (*Levitt*, *supra*, 156 Cal.App.3d at p. 510; see *People v. Hecker* (1895) 109 Cal. 451, 463 [a person placed in imminent danger may slay his aggressor in self-defense, but the person must act "in good faith to the sole end of winning his safety and securing his life"]; *People v. Vernon* (1925) 71 Cal.App. 628, 629 [it was "a correct statement of the law" to interpret the word "alone" in section 198 to "limit[] the right to take the life of another in self-defense to cases where the act is done under the influence of fear of the danger designated"].)

28

The Court of Appeal in *Trevino* clarified that this rule does not "imply that a person who feels anger or even hatred toward the person killed, may never justifiably use deadly force in self-defense." (*Trevino*, *supra*, 200 Cal.App.3d at p. 879.) "[I]t would be unreasonable to require an absence of any feeling other than fear, before the homicide could be considered justifiable. Such a requirement is not a part of the law . . . . Instead, the law requires that the party killing *act* out of fear alone. . . . The party killing is not precluded from feeling anger or other emotions save and except fear; however, those other emotions cannot be causal factors in his decision to use deadly force. If they are, the homicide cannot be justified on a theory of self-defense. But if the only causation of the killing was the reasonable fear that there was imminent danger of death or great bodily injury, then the use of deadly force in self-defense is proper, regardless of what other emotions the party who kills may have been feeling, but not acting upon." (*Ibid.*)

Here, it was for the jury to decide whether defendant acted out of fear alone when he shot and killed Pham. Murray's testimony that the driver of the Honda held a gun to his chest and smiled at Murray as he waited for Pham to approach is sufficient evidence to support a finding by the jury that defendant did not act out of fear alone.

We note that defendant did not argue in the trial court, nor has he argued on appeal, that the jury should have been instructed that acting based on mixed motives is permissible so long as reasonable fear was the but-for cause of his decision to kill. We therefore have no occasion to consider whether such a rule would be consistent with section 198 as interpreted in *Trevino* or other cases. Instead, defendant contends that the phrase "such fears alone" that appears at the end of section 198 does not mean that the person must act only on the basis of such fears but "plainly refers to 'the fears of a reasonable person.' " Defendant argues that this clause "was meant to make clear that only 'fears' that meet the

29

'reasonable person' test — i.e., 'such fears alone' — are sufficient to justify a killing as self-defense." However, none of the authorities cited above interprets section 198 in the manner suggested by defendant.

Defendant argues in the alternative that even if there was at least one valid legal theory under which the jury could have rejected his self-defense claim, his convictions must still be reversed because the prosecution relied on several improper legal theories. This contention lacks merit.

Of the six theories defendant alleges were introduced, four of them — mutual combat, sole motivation, initial aggressor, and contrived self-defense — were legally valid as presented here, and the jury was free to determine whether the evidence relating to any of these theories was sufficient to defeat defendant's self-defense claim. (See *Griffin v. United States* (1991) 502 U.S. 46, 59 ["[T]he term 'legal error' means a mistake about the law, as opposed to a mistake concerning the weight or the factual import of the evidence," where, "for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime."]; *People v. Harris* (1994) 9 Cal.4th 407, 419 [legally invalid theory is one "which, if relied upon by the jury, could not *as a matter of law* validly support a conviction of the charged offense"]; *People v. Guiton* (1993) 4 Cal.4th 1116, 1129 [inadequacy of a given theory is "legal, not merely factual . . . when the facts do not state a crime under the applicable statute"].)

Defendant contends that the two remaining theories were raised when the prosecutor's argument to the jury "exploited language in the jury instructions so as to suggest that self-defense principles appl[y] only to 'decent,' 'reasonable,' and 'basically good' people and not to gang members," and also suggested to the jury that "self-defense was not available unless the defendant not only reasonably *believed* he was in imminent danger but also *had an emotional reaction of fear to*

30

the danger." Even assuming that the "prosecutor arguably misstated some law, . . . such an error would merely amount to prosecutorial misconduct [citation] during argument, rather than trial and resolution of the case on an improper legal basis." (*People v. Morales* (2001) 25 Cal.4th 34, 43.) As defendant acknowledges, he did not object at trial to these prosecutorial comments, nor did he ask the trial court to modify or clarify any of the relevant jury instructions. His claims regarding these comments are therefore forfeited. (*People v. Mills* (2010) 48 Cal.4th 158, 194; *People v. Jablonski* (2006) 37 Cal.4th 774, 809; *Morales*, at p. 44.)

Finally, defendant relies upon matter that is outside the record to argue that defendant's smile was irrelevant because "[f]or non-Vietnamese persons, 'a smile [of a Vietnamese person] means little and cannot be read.' " Whether or not this is true, no evidence on this point was admitted at trial, and we will not consider it for the first time on appeal. (*People v. Jennings* (2010) 50 Cal.4th 616, 684–685, fn. 34.)

### 2. *Manslaughter*

Defendant argues that he could be convicted of no offense greater than manslaughter for killing Pham. Defendant first cites *People v. Sanchez* (1864) 24 Cal. 17, 27, for the rule that a killing committed during mutual combat " 'reduce[s] the offence from murder to manslaughter.' " But *Sanchez* did not so hold. *Sanchez* held that the trial court properly refused to instruct the jury as follows: " 'When, upon sudden quarrel, two persons fight, and one of them kills the other, this is voluntary manslaughter; and so if they, upon such occasion, go out and fight in a field, for this is one continued act of passion.' " (*Id.* at p. 26.) This instruction was incorrect because "[i]t ignores entirely the doctrine that in case of mutual combat, in order to reduce the offence from murder to manslaughter, it must appear that the contest was waged upon equal terms, and no

31

undue advantage was sought or taken by either side." (*Id*. at p. 27.)  At most, *Sanchez* stated in dicta that a killing that results from a "sudden quarrel" is voluntary manslaughter.  (See *People v. Lee* (1999) 20 Cal.4th 47, 60, fn. 6.)  As defendant acknowledges, this court held in *People v. Bush* (1884) 65 Cal. 129, 132 that " 'when parties by mutual understanding engage in a conflict with deadly weapons and death ensues to either, the slayer is guilty of murder.' "

Defendant also cites *Levitt* for the rule that his offense could be no more than manslaughter if he acted with the multiple motivations of self-defense and a desire to kill.  But defendant misreads *Levitt*.  *Levitt* was convicted of voluntary manslaughter and challenged his conviction on the ground that "there was insufficient evidence of manslaughter in that the record establishes complete self-defense as a matter of law."  (*Levitt*, *supra*, 156 Cal.App.3d at p. 509.)  The Court of Appeal rejected that argument, stating "if the degree of force used was influenced by any motivations aside from a belief in the necessity to act in self-defense, then manslaughter was an appropriate verdict on that ground alone.  In order for homicide to be completely justified in self-defense, 'the circumstances must be sufficient to excite the fears of a reasonable person, *and the party killing must have acted under the influence of such fears alone*.' "  (*Ibid*.)  *Levitt* thus held only that the defendant's conviction for manslaughter was supported by substantial evidence; *Levitt* did not suggest that a defendant who is motivated to kill by both self-defense and a desire to kill may never be convicted of an offense greater than manslaughter.

### 3. *Jury instructions regarding self-defense*

Defendant argues that the trial court erred in refusing to instruct the jury that "[t]he law of self defense applies equally to all persons, regardless of whether

32

he or she is a member of a criminal street gang." The court denied the proposed instruction without comment or argument.

The trial court instructed the jury at length regarding self-defense, saying that a killing is justified "and not unlawful when the person who does the killing" reasonably believes there was an imminent danger and it was necessary to use force "for the purpose of avoiding death or great bodily injury to himself." The instructions referred to "the fears of a reasonable person placed in a similar position" and stated that the danger must be apparent to "a reasonable person." Most importantly, the trial court instructed the jury that "[h]omicide is justifiable and not unlawful *when committed by any person* in the defense of himself . . . ." (Italics added.) The court's instructions left no doubt that the law of self-defense applies equally to all persons. Defendant's proposed instruction was duplicative and unnecessary.

Defendant also argues that the trial court erred in refusing his request to instruct the jury on imperfect self-defense. During its discussion of jury instructions, the trial court announced that it had determined "that there is insufficient evidence for the court to instruct sua sponte or upon request of counsel for defendant as to what's called the 'imperfect self-defense.' "

"Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." (*In re Christian S.* (1994) 7 Cal.4th 768, 771.) "[J]ust as with perfect self-defense or any defense, '[a] trial court need give a requested instruction concerning a defense *only if there is substantial evidence to support the defense*.' " (*Id*. at p. 783.)

33

The jury could reasonably have found that the gun battle that resulted in the death of Pham began when Pham, who was carrying a gun, approached the car that defendant was driving. Just before Pham arrived at the driver's side window of the Honda, defendant pulled out a gun and fired at Pham; Pham fired back. Pham died at the scene after being shot twice in the back and once in the head. Under these facts, the trial court was correct that there was no basis for the jury to find that defendant *unreasonably* believed he was in imminent danger of death or great bodily injury. If anything, the evidence suggests that such fear was reasonable but that the jury, in rejecting defendant's claim of self-defense, concluded that defendant did not act out of such fear alone. The trial court was correct, therefore, in declining to instruct on imperfect self-defense.

Defendant next argues that the trial court erred in failing "to instruct the jury sua sponte on the legal meaning of 'mutual combat.' " The trial court instructed the jury that "[t]he right of self-defense is only available to a person who engages in mutual combat if he has done all of the following: one, he has actually tried in good faith to refuse to continue fighting; two, he has clearly informed his opponent that he wants to stop fighting; three, he has clearly informed his opponent that he has stopped fighting; and, four, he has given his opponent the opportunity to stop fighting."

Defendant relies upon *Ross* to argue that the trial court was required to define the term "mutual combat," but *Ross* does not so hold. The defendant in *Ross* was convicted of aggravated assault and battery for punching the victim in the face, fracturing her cheekbone, after she slapped him during an argument. The trial court instructed the jury, over defense objection, that the defendant had not acted in self-defense if he had been engaged in "mutual combat" with the alleged victim. During deliberations, the jury asked for a legal definition of "mutual combat," but the trial court refused, telling the jury "to rely on the ordinary

34

meaning of those words." (*Ross*, *supra*, 155 Cal.App.4th at p. 1036.) The Court of Appeal reversed the defendant's conviction, ruling that "[t]his left the jury free to suppose that any exchange of blows disqualifies both participants from claiming a right of self-defense" when in fact "the doctrine applies only to a violent confrontation conducted pursuant to prearrangement, mutual consent, or an express or implied agreement to fight." (*Ibid.*)

The Court of Appeal in *Ross* observed: "Like many legal phrases, 'mutual combat' has a dangerously vivid quality. The danger lies in the power of vivid language to mask ambiguity and even inaccuracy. Here the jury was told that participation in 'mutual combat' conditionally bars the participants from pleading self-defense if either is prosecuted for assaulting the other." (*Ross*, *supra*, 155 Cal.App.4th at p. 1043, fns. omitted.) "The trouble," the court reasoned, "arises from 'mutual.' When, for these purposes, is combat 'mutual'? What distinguishes 'mutual' combat from combat in which one of the participants retains an unconditional right of self-defense?" (*Id*. at pp. 1043–1044.) The Court of Appeal concluded that the trial court erred in telling the jury to rely upon the common meaning because "the lay meaning of 'mutual combat' is too broad to convey the correct legal principle." (*Id*. at p. 1044.)

*Ross* reasoned that the problem with the common definition of "mutual" is that "any combat may be correctly described as 'mutual' so long as it is seen to possess a quality of reciprocity or exchange. In ordinary speech, then, 'mutual combat' might properly describe any violent struggle between two or more people, however it came into being. If A walks up to B and punches him without warning, and a fight ensues, the fight may be characterized as 'mutual combat' in the ordinary sense of those words." (*Ross*, *supra*, 155 Cal.App.4th at p. 1044.) *Ross* held that "mutual combat" refers instead to " '*a duel or other fight begun or continued by mutual consent or agreement, express or implied*. [Citations.]'

35

(Italics added.)  In other words, it is not merely the *combat*, but the *preexisting intention to engage in it*, that must be mutual."  (*Id*. at p. 1045, fn. omitted.)  Following the decision in *Ross*, the standard instruction was revised to add in brackets:  "A fight is *mutual combat* when it began or continued by mutual consent or agreement."  (CALCRIM No. 3471 (rev. 2008).)

 *Ross* did not hold that a trial court has a sua sponte duty to instruct the jury on the meaning of mutual combat, but rather that the trial court in that case erred by refusing the jury's request to clarify the term.  *Ross* relied upon section 1138, which requires that "[a]fter the jury have retired for deliberation, . . .  if they desire to be informed on any point of law arising in the case, . . . the information required must be given . . . ."  The Court of Appeal noted that the defendant in *Ross* had not attacked the original jury instruction on mutual combat, stating:  "We are more concerned with the court's failure to elaborate on the instruction after the jury expressly asked the court for a 'legal definition' of mutual combat.  Penal Code section 1138 cast upon the court a ' "mandatory duty" ' to 'clear up' the jury's understanding."  (*Ross*, *supra*, 155 Cal.App.4th at p. 1047.)  *Ross* held that the court was obligated to define the term "mutual combat" because the jury had " ' "exhibit[ed] confusion over the term's meaning." ' "  (*Ibid*.)

 "When, as here, a phrase 'is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request.' "  (*People v. Rowland* (1992) 4 Cal.4th 238, 270–271.)  As noted, although *Ross* discussed potential ambiguity in the term "mutual combat," it did not hold that a trial court has a sua sponte duty to explain it to the jury.  If defendant believed the instruction was incomplete or misleading, he "had the obligation to request clarifying language."  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1192 (*Rodrigues*).)  Moreover, the jury did not request that the trial court

36

clarify the meaning of the term. The trial court did not have a sua sponte obligation to define "mutual combat."

Defendant also argues that the trial court erred in failing to instruct the jury sua sponte "on the legal concept of impossibility of withdrawal" or, in the alternative, that if the trial court had no sua sponte duty to instruct, then trial counsel was ineffective in failing to request such a jury instruction. Without citation to authority, defendant asserts that "it was error for the trial court to have failed to instruct the jury that these doctrines [that a person who is the initial aggressor or is engaged in mutual combat] do not apply where a defendant, who might otherwise be deemed a mutual combatant based solely upon conduct occurring on an earlier occasion, is the victim of an attack that is so sudden and perilous that no opportunity exists to decline or to make known to his adversary his willingness to decline the strife."

As noted, there was no error in the trial court's instructions regarding self-defense, and if defendant believed the instruction was misleading, he "had the obligation to request clarifying language." (*Rodrigues*, *supra*, 8 Cal.4th at p. 1192.) Nor was trial counsel ineffective in failing to request clarifying language. To establish ineffective assistance of counsel, " ' "a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' " ' " (*People v. Weaver* (2001) 26 Cal.4th 876, 925.) " '[T]here is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' " (*Ibid*.) "In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*Id*. at p. 926.) For this reason, claims of ineffective assistance of counsel "are ordinarily best

raised and reviewed on habeas corpus." (*People v. Williams* (2013) 56 Cal.4th 630, 690.) In the present case, "[t]he claim fails in the context of this direct appeal because the record does not reveal whether counsel had a plausible tactical reason for not requesting the instruction" (*People v. Carter* (2003) 30 Cal.4th 1166, 1223), and defendant fails to show that there could be no conceivable reason for trial counsel not to request such a clarifying instruction.

Defendant further contends that the trial court erred in failing to instruct the jury on ignorance or mistake of fact. Specifically, he argues that a theory of mutual combat or any similar theory refuting his claim of self-defense could not apply "unless appellant recognized that his assailants were from the Cheap Boys gang." Accordingly, he claims, the trial court should have instructed the jury that a mutual combat or similar theory was "inapplicable if appellant did not know his assailants were Cheap Boys." In the alternative, defendant argues that if the trial court had no sua sponte duty to instruct, then trial counsel was ineffective in failing to request such a jury instruction.

"A trial court's duty to instruct, sua sponte, on particular defenses arises ' "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' " (*People v. Maury* (2003) 30 Cal.4th 342, 424.) Defendant testified in his own defense that he was in the back seat of the white Honda when the driver indicated that something was wrong. Defendant said he turned and looked through the rear window and saw someone pointing a shotgun at him. He ducked just as the person fired the shotgun and stayed down throughout the ensuing gun fight until the driver drove away from the scene. Thus, defendant did not rely on a mistake-of-fact defense that he shot the victim in self-defense because he did not know that his assailants were from the Cheap Boys gang. Rather, defendant asserted that he did not shoot anyone. The

fact that defendant testified on cross-examination that he did not recognize the person with the shotgun and did not know what gang that person was from does not constitute substantial evidence in support of a mistake-of-fact defense that he shot Pham because he did not know that Pham was a member of the Cheap Boys gang.

### 4. *Admission of Officer On's testimony*

Defendant argues that the trial court erred in admitting the testimony of Garden Grove Police Officer Vincent On that a young man he saw flee from a car the officer had stopped looked similar to a photograph of defendant.

On May 23, 1995, 17 days after Tuan Pham was killed, Garden Grove Police Officer Mike Smith saw "three Oriental men" enter a silver Ford Escort. Two of the men were later identified as members of the Nip Family. The third was a man five feet two inches to five feet five inches tall.

When Officer On pulled over the Ford Escort, the unidentified passenger ran away. A police dog later located a Colt .380 revolver in some bushes near where the fleeing passenger was last seen. Ballistics tests showed that the Colt pistol had fired a bullet recovered from the car Tuan Pham had been driving when he was killed.

Officer On was unable to identify the fleeing passenger, saying only he was a "male Asian" "about five-two to five-four, thinly built, and he had a light complexion." A short time later, Officer On was recalled as a witness and testified that "approximately 15 to 20 minutes prior" to stopping the vehicle, Officer On had seen a "picture of somebody named Lam Thanh Nguyen." Officer On agreed, without objection, that based upon that picture, the fleeing passenger "looked similar . . . to Lam Thanh Nguyen." Officer also agreed that based upon that picture, he believed at the time that the fleeing passenger "could be Lam Thanh

39

Nguyen." Defendant objected, asserting "lack of foundation, as to whether or not this picture he is relying upon is in fact Mr. Lam Nguyen." The court overruled the objection.

Even if the trial court erred in admitting this testimony, the error could not have affected the judgment. Officer On's testimony that he believed at the time that the fleeing passenger could have been defendant had little probative value. Officer On did not positively identify defendant as the person who fled from the car or even testify that he currently believed that defendant was the person who fled from the car. He merely agreed that, at the time, he believed that the fleeing passenger could have been defendant.

### C. Issues Related to the July 21, 1994, Shooting of Tony Nguyen

#### 1. *Sufficiency of evidence of attempted murder*

Defendant argues that the evidence was insufficient to convict him of the attempted murder of Tony Nguyen and the related charge of active participation in a gang on an aiding and abetting theory.

The evidence showed that defendant was a passenger in the back seat of a car driven by a young woman named My Tran. A man named Nghia Phan was sitting in the front passenger seat. At an intersection in Garden Grove, the car started following a car driven by Tony Nguyen, which carried several members of the Cheap Boys gang. At one point, the car in which defendant was riding passed Tony's car, and defendant and the other passengers stared back at the car. The car in which defendant was riding then idled in the parking lot of a fast food restaurant, with its occupants "all like looking out and stuff." After Tony's car passed the restaurant, the other car pulled out of the parking lot and followed. Several blocks later, the two cars stopped next to each other at a stop light. When the traffic signal turned green, Phan shot Tony Nguyen in the neck before the car

Phan was in drove away. A few days later, defendant went to the apartment of Vinh Kevin Lac, one of the Cheap Boys members who had been in the car driven by Tony Nguyen, and asked him, "What's up with the cops?" Lac assured defendant that he had said nothing to the police but, at trial, identified defendant as the person in the other car who sat in the back seat behind the shooter.

Detective Nye, the prosecution's gang expert, testified based on his experience interviewing "several thousand" Asian gang members in Orange County, including "somewhere between 40 and 50" Nip Family members, that Asian gangs tended not to be associated with a particular "turf." Instead, they "go from place to place around the community hunting for their rivals." Detective Nye explained that "if they're not the shooter and they're in the back seat" of the car, a gang member would be expected to serve as a lookout, and "[i]f something were to happen and they would have to bail out of the car, that member would be expected to back that person up. Be it assault somebody, be it shoot somebody, be it take over the driving of the vehicle, whatever it may be." Detective Nye also testified that at the time of the shooting, the Nip Family and the Cheap Boys were in a state of war, and members of both gangs were expected to be able to engage in gunfights with their rivals "at a moment's notice."

"A 'person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' " (*People v. Marshall* (1997) 15 Cal.4th 1, 40.) "[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended

41

killing — which means that the person guilty of attempted murder as an aider and abettor must intend to kill." (*People v. Lee* (2003) 31 Cal.4th 613, 624.)

"Whether a person has aided and abetted in the commission of a crime ordinarily is a question of fact. . . . [¶] . . . [¶] Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense." (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094–1095.) " ' "When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence — i.e., evidence that is credible and of solid value — from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." ' " (*People v. Hill* (1998) 17 Cal.4th 800, 848–849.) "Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.)

Reviewing the evidence here in the light most favorable to the judgment, we conclude that there was sufficient evidence to support defendant's conviction. Although defendant's " 'mere presence alone at the scene of the crime is not sufficient to make [him] a participant,' " his presence in the car " 'may be [a] circumstance[] that can be considered by the jury with the other evidence in passing on his guilt or innocence.' " (*People v. Durham* (1969) 70 Cal.2d 171, 181.) The car in which defendant was riding passed Tony's car, waited in a parking lot, and then pulled out to pursue the other car. Defendant stared back at the occupants of Tony's car as one car passed the other. A few blocks later, Nghia Phan opened fire from the front seat of the car in which defendant was riding. Several days after the shooting, defendant visited Lac, who had ridden in Tony's car, and asked "What's up with the cops?" Considering this evidence in the

42

context of the ongoing gang war between the Nip Family and Cheap Boys, as well as the Asian gang practices described by Detective Nye, the jury could have inferred that defendant knew of Nghia Phan's intent to kill, shared that intent, and aided Phan by spotting potential targets.

Although "gang evidence standing alone cannot prove a defendant is an aider and abettor to a crime" (*People v. Guillen* (2014) 227 Cal.App.4th 934, 992), Detective Nye's expert testimony strengthened inferences arising from other evidence specific to defendant's role in the crime at issue. Among other things, Detective Nye described how Asian gang members in Orange County would drive around "hunting for their rivals," and he explained that the Nip Family and Cheap Boys were already in a state of war at the time of this shooting. Understood in that context, defendant's act of staring at the occupants of Tony's car — followed by his car's maneuver in and out of the restaurant parking lot — could have supported the inference that defendant was aware of the impending shooting and acted to facilitate it by identifying Cheap Boys members riding in Tony's car.

Appellate inquiry into the sufficiency of the evidence "does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.) In other words, "it is the jury, not the appellate court which must be convinced of the defendant's guilt." (*People v. Bean* (1988) 46 Cal.3d 919, 933.) Although the issue is close, the record here contains substantial evidence from which the jury could have found beyond a reasonable doubt that defendant knew of and shared Phan's intent to kill Tony Nguyen and acted to further the shooting. This evidence

was also sufficient to support defendant's related conviction for active participation in a gang.

### 2. *Impeachment of Vinh Kevin Lac*

Defendant argues that the trial court erred in excluding evidence proffered by the defense to impeach the testimony of Vinh Kevin Lac, who identified defendant as the person in the back seat of the car from which Nghia Phan shot Tony Nguyen. Defendant contends that these errors violated his federal constitutional rights to due process, to present a defense, to compel the testimony of witnesses, and to confront adverse witnesses.

Lac testified that he was sitting in the front passenger seat of the car driven by Tony Nguyen. He thought the person sitting in the car from which Phan shot Tony Nguyen looked familiar, but it was not until a few days later that he realized it was defendant, who lived in the same apartment building as he did. Lac identified defendant in court as the person in the back seat of the shooter's car.

On cross-examination, Lac testified that after Tony Nguyen was shot and the car came to a stop, Lac got out and walked away. Lac said he did not have a gun and did not know whether Truong Nguyen, who had been with him in the car, had a gun. Defense counsel asked whether Lac was "aware that there are witnesses out there that saw somebody with a gun." Lac said he was not aware of that and answered, "I don't know," when asked whether those witnesses would "be lying or telling the truth" if they so testified. During a recess, outside the presence of the jury and the witness, the court commented to defense counsel that "the questions you start putting to him about a gun and other people seeing a gun" were "so far afield." The court expressed the "hope you don't drift into things like that." Defense counsel assured the court: "No, that was the extent of my questions."

Several days later, the prosecutor objected outside the presence of the jury that defendant intended to call witnesses to establish that someone from Tony Nguyen's car was seen running away from the scene carrying a gun. Defense counsel responded: "Kevin Lac testified that he didn't have a gun, he didn't see any guns. And it's used for impeaching his testimony. He's obviously perjured himself." The prosecutor retorted that the proffered evidence would not "show that Kevin Lac saw that gun or had the gun" and would not "show that the gun came from the victim's car." The court conducted a hearing to "find out whether [the defense] can lay the foundation as to what [the witnesses] saw."

Alicia Trujillo testified at the hearing that she had heard shooting and ran out to the front of the medical office where she worked. She saw Tony Nguyen's car stopped at the curb and "witnessed a gentleman, a young guy, run across the window with a weapon in his hand." She did not know where the person carrying the gun had come from.

Carolyn Hunt testified at the hearing that she had also been working in the office, but she did not see anyone carrying a gun.

Laura Hughey came into the front office after the shooting and "saw a young Vietnamese man in his, I believe, late teens come running from the area of the car that was involved in the accident where the young man who was shot, . . . and as he was running in front of the window, he was putting a large pistol inside the front of his pants."

The court concluded that none of the three witnesses could say where the person carrying the gun had come from: "it would have to be a guess on anybody's part where that person was coming from." The court ruled: "I will preclude any reference to seeing a person running with a weapon in view of the [hearing] that we have conducted here."

45

The following day, another hearing was held outside the presence of the jury at which Gene Melancon testified that he had been a patient in the medical office and looked out the window when he heard the shooting. He saw Tony Nguyen's car come to a stop. A man got out of the front passenger seat and placed a handgun in the waistband of his pants. The court then permitted Melancon to testify to those facts before the jury.

That same afternoon, a hearing was held outside the presence of the jury at which Floriberto Villanueva testified that he had been at a taco stand when he heard gunshots and saw Tony Nguyen's car come to a stop. A man "got out running with a gun in his hand." The court then permitted Villanueva to so testify before the jury. The court then affirmed its ruling the day before excluding the testimony of Trujillo and Hughey, stating "that any additional testimony would be cumulative."

The trial court did not err in excluding the testimony proffered by the defense that witnesses Trujillo and Hughey had seen a man with a gun near the car in which Tony Nguyen had been shot. The defense offered this testimony to impeach Lac's testimony that he was not carrying a gun and did not know whether Truong Nguyen was carrying a gun. The trial court was correct that the testimony of Trujillo and Hughey was cumulative once the defense produced the testimony of Melancon and Villanueva that they had seen a man leaving the car carrying a gun.

Defendant also argues that the trial court erroneously restricted his cross-examination of Lac. Defense counsel cross-examined Lac at length regarding his identification of defendant as the person in the back seat of the shooter's car. While the prosecutor's direct examination of Lac consumed 25 pages of the reporter's transcript, cross-examination consumed 80 pages.

46

Following a brief redirect examination by the prosecutor, defense counsel again cross-examined Lac and the following exchange took place:

"[Defense Counsel] Do you know what you're trying to communicate to the officer when you looked at the photographic display that we now know contains the Lam photograph, and says 'Who are these guys? Are they N.F. [Nip Family]? They look pretty old. I don't know who they are. No. I don't know any of them.' What were you trying to convey to the police officers asking you to make an identification back on May 25th, 1995?

"[Lac] I wasn't conveying nothing. I was just asking them a question.

"Q And then you told him I don't know anybody in that photographic display, which has Lam's picture, right?

"A I guess I did. I'm not sure.

"Q When you say 'I guess I did,' that means you're not really sure, right?

"A Yes.

"Q Okay. That means I have to come up and refresh your recollection then, right?

"A Go ahead.

"Q Okay.

"A All right.

"Q When you were shown C, which is the photographic display with Lam's picture in it, you told the officer 'I don't know who they are. I don't know who they are either. No, I don't know.' And the officer said 'do you know any of them at all?' And you said 'No, these guys are old.' Do you remember making that statement?

"A Yep.

"Q Okay. And there's no question in your mind that statement is coming out of your mouth, right?

47

"A  Right.

"Q  And you're positive about that, right?

"A  About what?

"Q  About you making that statement that 'I don't know who they are.  I don't know any of these guys.  No.  These are old guys'?

"A  Yeah, I said that.

"Q  Okay.  And you're sure of that, right?

"A  It's right there, so, yeah.

"Q  No question in your mind, right?

"A  What?

"Q  No question?

"A  No question about what?

"Q  About you —

"A  Me saying that?

"Q  Those words, yeah.

"A  No.  If it's on the paper, no.

"Q  And then there's another officer saying would you know any of these guys['] names, or do you think you've seen them before?  And you answered no again; isn't that true?

"A  That's true.

"Q  And you're sure about that, right?

"A  Yes.

"Q  And you're positive about that, right?

"A  That's three times with a yes.

"Q  Okay.  Well, there's — so you don't think you said it, you know you said you did not know any of these guys in the photograph; right?

"A  If that's what the paper says, yes.

48

"Q And isn't it also true, that after having reviewed what the paper says, you are convinced that you made a couple comments about the guys looking like — two guys looking like old farts and two guys looking younger, you're sure about that now, right?

"A I'm sure about that.

"Q Positive about that?

"A Yeah.

"Q And it's not a matter of thinking about it, you know that that's a fact. You made those statements, right?

"A Show me the page again. Yeah. The interview was like an hour and a half. I said a lot of stuff that I don't remember, you know. You're just hitting the ones that you want to try to get me on. There's a lot of stuff in there that would help out the guys. You just want to get no, yes, no, no, yes.

"Q You want to show me where you made any type of identification on May 25th, 1995?

"A Where does this start with?

"THE COURT: May I see counsel."

In chambers, the court said: "I think a record has been made as to what took place on the 25th of May, '95, in terms of Exhibit C and his prior statements that are recorded. . . . I don't know that it benefits either party or anybody to continue this line of questioning." Defense counsel replied that his concern was that Lac had said there was information in the transcript of the preliminary hearing that favored the prosecution. The court responded that it did not "think we're going to go anywhere at this point. You have established clearly for the jury that on the 25th of May he did not make an identification. . . . So, I'm asking [for] a cease fire at this point. I don't think we're going to do anything worthwhile. If I missed something, this is the time for you to tell me."

49

The following exchange ensued:

"[Defense counsel]:  No, I hear you, your honor, but can I ask one last question? . . .  I'm going to ask him have you found the spot yet where you did make your identification.

"THE COURT:  No, because I think that was an argumentative question, because he had not indicated that he made an identification on the 25th of May. . . .  And I'm going to ask . . . you to not do that.

"[Defense counsel]:  Well, okay, your honor."

Re-cross examination by defense counsel resumed, and the following took place:

"[Defense counsel]  Are you still looking for something?

"[Lac]  Just reading this.

"[Defense counsel]  Okay.  Let me know if you've found anything interesting, okay?

"[The prosecutor]:  Objection, argumentative.

"THE COURT:  It is.  My instincts were correct.  So, that's it.  You're done."

The trial court did not err.  The transcript shows that the trial court allowed defense counsel to repeatedly question Lac in order to demonstrate that he made no identification of defendant in his statement to police on May 25, 1995.  Defense counsel's questions accomplished that purpose, and the trial court did not abuse its discretion to impose reasonable restrictions on re-cross examination to avoid argumentative questioning.  (*People v. Hines* (1997) 15 Cal.4th 997, 1047.)

### 3. *Testimony of Probation Officer Steven Sentman*

Defendant contends that the trial court erred in several respects regarding the testimony of Steven Sentman, a witness called by the prosecution to rebut

50

defendant's alibi. He argues that these errors violated various rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

Defendant testified in his defense that he had been in Alabama when Tony Nguyen was shot on July 21, 1994 and when Huy Nguyen was shot on November 24, 1994. Defendant's sisters, Phuong and Nen Nguyen, corroborated his testimony. When the defense rested, the prosecutor indicated that defendant's former probation officer, Steven Sentman, would be one of the witnesses the prosecutor planned to call on rebuttal. Defendant objected on the grounds that Sentman had been in the courtroom during defendant's testimony despite the fact that "witnesses were supposed to be excluded." The trial court stated: "I don't know Sentman from anybody else. It's hard to control that unless counsel gives me some assistance in that regard." The court later denied defendant's motion to bar Sentman from testifying, stating: "I wasn't advised that he was in the courtroom, in a timely fashion. And I'm not faulting counsel. Apparently you didn't know that they were thinking of calling him as a witness." The court added that "the area that he plans to testify to doesn't appear to be impacted by or prejudiced by the fact that he was here while the defendant was testifying."

Citing *People v. Valdez* (1986) 177 Cal.App.3d 680, 691 (*Valdez*), defendant argues that the trial court should not have permitted Sentman to testify because "he had violated a court order by attending court during appellant's testimony." Defendant does not cite any portion of the record indicating that the trial court entered an order excluding potential witnesses from the courtroom. Even assuming the trial court had issued such an order, the fact that Sentman was in court prior to the time that he was designated as a witness was not grounds to prohibit him from testifying.

In *Valdez,* the trial court granted the prosecutor's motion to exclude witnesses from the courtroom, but permitted the defendant's expert witness to

remain and assist defense counsel in cross-examining the prosecution's expert witness. Defense counsel did not later call his expert as a witness and argued on appeal that the trial court's order denied him his right to call his expert as a witness. The Court of Appeal concluded that the trial court did not abuse its discretion because defense counsel "did not give the court any persuasive reason for denying outright or making an exception to an order granting the prosecutor's motion to exclude witnesses." (*Valdez*, *supra*, 177 Cal.App.3d at p. 688.)

*Valdez* held that the trial court did not abuse its discretion in issuing an order excluding witnesses from the courtroom despite the fact that this would mean that the defendant could not use the same expert to advise him during cross-examination of the prosecution's expert and later to testify as an expert on the defendant's behalf. (*Valdez*, *supra*, 177 Cal.App.3d at p. 688.) Defendant does not contend that this case presents a similar scenario. Instead, he relies upon *Valdez*'s observation in dicta that although the usual "remedy for a violation of an exclusion order is contempt, not disqualification of the witness" (*id.* at p. 692), disqualification may be appropriate if counsel is at "fault" for choosing to have a potential witness present during testimony and later calling that person as a witness in knowing violation of the court order. (*Ibid.*) But this is not what happened here. The record does not show that the prosecutor knew that Sentman would be called as a witness prior to defendant's testimony.

Defendant next argues that the trial court "should have imposed a strong sanction" because the prosecutor belatedly disclosed field notes on which Sentman relied. At the beginning of the court session at which Sentman testified, the prosecutor provided the officer's field notes, which showed that defendant had met with the officer on July 19, 1994, two days before Tony Nguyen was shot. Relying upon those notes, Sentman testified that he saw defendant in Sentman's office on July 13 and 19, 1994. After Sentman finished his testimony, both sides

rested, and the jury was released for the day. Defendant then produced a copy of the subpoena that had been served on the probation office on April 23, 1996, asking for "any and all probation records . . . pertaining to the probation and supervision of Lam Thanh Nguyen." Defense counsel stated: "I just want to make that as a court record because we were trying to get these documents for over two years, and all of a sudden these field notes show up this morning." The prosecutor stated that defendant had never requested discovery of probation office records from the prosecution and that the first time she had seen Sentman's field notes was that morning. The record does not indicate that defendant asked the trial court to impose sanctions on the prosecution for having failed to provide the field notes sooner.

The day after Sentman testified, defendant requested the following special jury instruction: "The probation officer[']s field notes which he used to prepare his 6 month chronological report of contacts with the defendant were not disclosed to the defense until 24 JUNE 1998. [¶] The failure to disclose those notes before that date may be considered in [] determining the accuracy of his notes and the credibility of the witness." The trial court refused the requested instruction, saying that although the field notes "had been properly subpoenaed," the court "did not find that the testimony should be stricken or precluded, nor do I think I should give this special instruction." The court also denied defendant's request to modify or "ton[e] down" the instruction.

Defendant claims the court's statement that it "did not find that the testimony should be stricken or precluded" shows that defendant had asked for such relief. But the trial court did not say that defendant had requested such relief, and the record does not indicate that defendant did so. Nor does defendant cite any authority to support his claim that the trial court should have imposed sanctions on its own motion.

53

Citing *People v. Riggs* (2008) 44 Cal.4th 248, 310, defendant claims the trial court erred in refusing his proposed special jury instruction. The defendant in *Riggs* had failed to timely disclose to the prosecution the names of alibi witnesses in violation of section 1054.5, subdivision (b), which provides that "the court may advise the jury of any . . . untimely disclosure." The trial court instructed the jury that if it found " 'that there was a failure by the defense to provide timely notice to the prosecution of the names and addresses of [alibi] witnesses . . . [y]ou may consider such failure, if any, in determining the weight to be given to the testimony of such witnesses.' " (*Riggs*, *supra*, 44 Cal.4th at p. 305.) *Riggs* upheld the instruction but explained that one important factor was whether an "attempt to gain a tactical advantage was behind the failure to timely disclose the evidence at issue." (*Id*. at pp. 308–309.)

Here, it does not appear that an attempt to gain a tactical advantage was behind the failure to disclose the field notes earlier. Defendant had not asked the prosecution for the probation records, choosing instead to subpoena the records from the probation office. There is nothing to indicate that Sentman had been aware of the subpoena or had been asked for his notes or any other materials at that time. Nor is there any indication that the failure to disclose the notes earlier somehow affected their accuracy. Accordingly, the trial court did not err in refusing defendant's special jury instruction.

Nor did the trial court err in barring defendant from calling as a rebuttal witness his older sister, Le Nguyen. Sentman finished his testimony on rebuttal on Wednesday, June 24, 1998. Defense counsel then stated that "in view of Sentman's testimony," defendant wished to call one witness on surrebuttal: defendant's older sister, Le Nguyen, with whom defendant had been living until shortly before Tony Nguyen was shot. According to defense counsel, Le Nguyen would testify that defendant lived with her until the end of June or the beginning

54

of July of 1994 until he left to go to Louisiana to stay with another sister.  The witness "did not drive him to the airport" and could only say she did not see him in California after that time.

Defense counsel added that he had no other witnesses and that Le Nguyen lived in Delaware and would have to be flown in to testify:  "We have to prepare orders, go through court services, probably get her out here Monday morning."  But the court warned:  "I'm not sure she'll testify, though. . . . [I]t doesn't appear that she can testify as to anything specific."

The next day, defendant filed a letter from his investigator that said he had spoken to Le Nguyen on the telephone and that she said defendant had lived with her "from March, 1994 until June, 1994" and "moved out of the apts [*sic*] and told her that he was going to Alabama to work in the seafood and shrimping industries."  The court asked defense counsel:  "Well, do we not have two witnesses that have already testified [o]n behalf of the defendant that the defendant had left for Alabama by the Fourth of July and that he was seen in Alabama on the Fourth of July and dates prior to the 19th of July?"  Defense counsel responded:  "We do."  The court tentatively ruled:  "It doesn't look like I'll permit that kind of testimony based on your offer of proof as things stand now," but the court invited defense counsel to be prepared the following day "to give me any additional offers of proof why this witness should be permitted to testify."

Defendant renewed his request the following day.  The court did not expressly rule and instead said:  "The reason for our discussion is, I don't want to take the risk of precluding the defendant from presenting evidence, or precluding the jury from hearing testimony that bears as to his whereabouts on the alleged dates of the offenses that occurred in '94.  If she was — if your offer of proof, including my review of the declaration submitted by [the investigator], would

55

indicate — would have some probative value in those areas, I would permit her to testify in surrebuttal."

"The decision to admit rebuttal evidence rests largely within the discretion of the trial court and will not be disturbed on appeal in the absence of demonstrated abuse of that discretion." (*People v. Young* (2005) 34 Cal.4th 1149, 1199.) The trial court did not abuse its discretion here. The proffered testimony of Le Nguyen would have been largely cumulative to the previous testimony of his other two sisters that he was in Alabama when Tony Nguyen and Huy Nguyen were shot.

### D. Issue Related to the November 24, 1994, Shooting of Huy Nguyen

Defendant argues that the trial court erred in refusing his request to instruct the jury on imperfect self-defense in the shooting of Huy Nguyen on November 24, 1994, and that this error violated his constitutional rights to due process, to a jury trial, and to present a defense.

As noted, Huy Nguyen testified that on Thanksgiving evening in 1994, he was standing outside the Mission Control video game arcade when a "guy" approached him and asked if he was in the Tiny Rascals Gang. Huy said he only had friends in the gang, but "[h]e thought that I belonged to T.R. [Tiny Rascals Gang], and then he hit me on the face one time." He remembered little of what happened after he was punched, but other witnesses testified that Huy Nguyen punched defendant in the face outside of the arcade, starting a fist fight in which several of Huy Nguyen's friends and defendant's friends joined. Defendant pulled a gun out of his waistband and shot Huy Nguyen in the stomach. Huy Nguyen stumbled into Mission Control. Defendant followed him inside and shot him several times more as he lay on the floor. Huy Nguyen was left partially paralyzed.

56

The trial court instructed the jury on self-defense, but it refused defendant's request to instruct the jury on imperfect self-defense. In a preliminary discussion of jury instructions, the court indicated that it found "insufficient evidence to justify either a sua sponte instruction, or one at the request of counsel for defendant." Defense counsel's only response was to ask whether that "includes the 5/6/95 incident," which was the murder of Tuan Pham.

"Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." (*In re Christian S.*, *supra*, 7 Cal.4th at p. 771.) " '[T]he trial court must instruct on this doctrine, whether or not instructions are requested by counsel, whenever there is evidence substantial enough to merit consideration by the jury that under this doctrine the defendant is guilty of voluntary manslaughter.' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)

"[B]oth self-defense and defense of others requires a fear of *imminent* harm [citation], so presumably imperfect self-defense . . . would require an unreasonable belief that harm was imminent." (*People v. Michaels* (2002) 28 Cal.4th 486, 530.) Here, there was insufficient evidence that defendant had either a reasonable or unreasonable belief that harm was imminent when he followed the wounded victim into the arcade and shot him several times as he lay on the floor. The trial court was not required to instruct the jury on imperfect self-defense.

**E.   Issues Related to the Gang Charges and Enhancements**

   *1.   Shooting of Huy Nguyen*

With regard to the November 24, 1994, shooting of Huy Nguyen, defendant claims there is insufficient evidence to support his conviction for participating in a gang in violation of section 186.22, subdivision (a) and the sentence enhancement for committing a crime for the benefit of a gang under section 186.22, subdivision (b)(1).  Defendant asserts the shooting of Huy Nguyen was, "at most, a personal dispute of some sort . . . that was apparently initiated" by the victim himself, and that his conviction violated his right to due process.  The record does not support defendant's argument.

Huy Nguyen testified that a "guy" approached him, asked if he was a member of a gang, and then punched him in the face.  Witnesses testified that the "guy" was defendant, that Huy Nguyen was indeed a member of a rival gang, and that gang members associated with both Huy Nguyen and defendant joined in the fight before defendant shot the victim.  This evidence supports the jury's verdict that defendant was an active participant in a gang under section 186.22, subdivision (a) and the jury's finding that defendant shot the victim for the benefit of a gang under section 186.22, subdivision (b)(1).  (See *People v. Livingston* (2012) 53 Cal.4th 1145, 1170–1171.)

Although defendant points out that the shooting of Huy Nguyen occurred "at a time when [defendant] was unaccompanied by any Nip Family member," he employs that fact to support his argument that the incident was personal, not gang-related.  He does not contest application of section 186.22, subdivision (a)'s requirement that a defendant "commit an underlying felony with at least one other gang member."  (*People v. Rodriguez*  (2012) 55 Cal.4th 1125, 1134.)  We therefore have no occasion to decide whether defendant's act of fighting alongside members of the Natoma Boys — a gang from which the Nip Family evolved and

58

that remained closely allied with defendant's gang — could have supported the jury's finding that defendant "willfully promote[d], further[ed], or assist[ed] in any felonious criminal conduct by *members of that gang*." (§ 186.22, subd. (a), italics added; see *People v. Velasco* (2015) 235 Cal.App.4th 66, 75 [concluding that the statutory phrase " 'that gang' clearly refers back to the 'gang' in which the defendant is an active participant"].)

### 2. *Gang participation*

Defendant further claims there is insufficient evidence to support his convictions of five counts of participating in a gang in violation of section 186.22, subdivision (a) and the jury's 10 true findings on sentence enhancement allegations for committing a crime for the benefit of a gang under section 186.22, subdivision (b) because "the evidence was insufficient to show that commission of crimes enumerated in section 186.22, subdivision (e), was one of the *primary* activities of the Nip Family."

Subdivision (a) of section 186.22 makes it a crime to "actively participate[] in any criminal street gang," and subdivision (b)(1) enhances the sentence for any "felony committed for the benefit of . . . any criminal street gang." The definition of a criminal street gang in subdivision (f) requires that the gang have "as one of its 'primary activities' " the commission of one or more of the criminal acts enumerated in subdivision (e). Evidence of both past offenses and the currently charged offenses may be considered in determining whether one of the primary activities of the gang is committing one or more of the offenses enumerated in the statute. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony . . . ." (*Id*. at p. 324.)

In the present case, Westminster Police Detective Mark Nye testified as an expert on gangs. He said that some of the primary activities of the Nip Family gang were "homicides, attempted homicides, assaults, assault with deadly weapons, home invasion robberies, burglaries, auto theft, narcotic sales." Nearly all of these are crimes enumerated in the statute. (§ 186.22, subd. (e).) This evidence was sufficient.

### 3. *Gang enhancements*

The Attorney General concedes that it was improper to add to each of defendant's convictions for the crime of gang participation a sentence enhancement for committing the crime for the benefit of a gang under section 186.22, subdivision (b)(1). We accept the Attorney General's concession, which accords with case law interpreting analogous provisions of section 186.22 as well as with the relevant legislative history. (See *People v. Briceno* (2004) 34 Cal.4th 451, 465; *Lopez v. Superior Court* (2008) 160 Cal.App.4th 824, 833–834; *People v. Arroyas* (2002) 96 Cal.App.4th 1439, 1445; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2013 (Reg. Sess. 1987-1988) as amended Aug. 30, 1988, par. 15, p. 2 [section 186.22, subdivision (a) offense is "a 'wobbler,' punishable by the minimum term of imprisonment in the county jail and the state prison for these offenses and [a section 186.22, subdivision (b)] enhancement of the underlying felony"].) Accordingly, we strike defendant's gang enhancements from the sentences imposed for actively participating in a gang in counts 3, 5, 7, 10, and 14.

### F. **Issues Related to the Entire Guilt Phase**

#### 1. *Defense investigator*

Defendant argues that he was denied the effective assistance of defense investigator Daniel Watkins primarily because Watkins had been engaged in

criminal conduct for which he was arrested shortly after the jury returned a verdict of death. Defendant contends that Watkins's actions violated his rights to due process and a fair trial, the effective assistance of counsel, confrontation of witnesses, and a reliable determination of guilt and penalty.

Following the penalty phase of the trial, on July 14, 1998, the jury returned a death verdict. After several continuances, on December 18, 1998, defendant filed a motion for a new trial "based on ineffective assistance of defense investigator." Defendant stated that shortly after Watkins was appointed as a defense investigator on March 6, 1996, defense counsel instructed him to locate and interview two potential witnesses — Salome Espinoza and Johnny Ngoc Tai — and to take photographs of the restaurant where Sang Nguyen was shot. Defendant alleged that Watkins failed to perform these duties competently because his attention was diverted by personal problems: "During the entire trial of the defendant, both on guilt and penalty, Watkins was enduring significant personal problems which diverted his attention from his investigation including but not limited to an acrimonious battle in court with his ex-wife over community property, child support, and spousal support." Defendant further alleged that Watkins was being prosecuted for attempting to silence a prosecution witness: "On May 13, 1998, Watkins was caught on tape with Henry Mai, another capital defendant, conspiring with Mai about 'putting the shut' on Khoi Huynh who was a critical prosecution witness who the defense was trying to interview." (See *People v. Mai* (2013) 57 Cal.4th 986.) Defendant asserted that defense counsel had instructed Watkins "on numerous occasions to seek an interview with Huynh, not to shut him up." Defendant added that Watkins also was being prosecuted for conspiring to murder "a witness in the Henry Mai death penalty case."

Attached to the motion for a new penalty trial was a copy of an affidavit for a search warrant that stated that Henry Mai had telephoned Watkins from jail on

May 13, 1998 and said, "You still want me to put a shut on Khoi," and asked for a certain document. Watkins responded, "Okay," but added, "Yeah, well, I don't want to know anything more about that." Watkins promised that he would deliver the document to Mai in jail. The affidavit says that the document was found in another inmate's jail cell during a subsequent search. Outside the presence of the jury, Huynh testified that Watkins never contacted him or asked him not to testify. Lyle Wilson, an investigator for the district attorney, testified that Huynh told him that no one had contacted him or asked him not to testify.

The trial court conducted a lengthy hearing. Upon questioning by the trial court, defense counsel said that although a new defense investigator had been appointed, that investigator had been unable to locate the two potential witnesses whom Watkins had been asked to locate.

Turning to the allegations that Watkins had conspired with Mai to convince Huynh not to testify, the court ruled that "there's insufficient evidence for the court to conclude that Watkins did, in fact, tell Huynh not to make any statements during the course of the trial." The trial court further ruled that Watkins's performance did not prejudice defendant: "I cannot say that there's been a sufficient or adequate showing to determine that the defendant was denied a fair trial . . . ." The trial court denied defendant's motion for new trial.

Even if we assume that Watkins was involved in a plot to silence Huynh and that Watkins's efforts influenced Huynh's testimony, defendant has failed to show he suffered prejudice. Huynh testified, and he was unwilling or unable at trial to identify defendant as the assailant. Defendant contends: "The damage to the defense from Khoi's faked memory loss was profound. . . . [T]he defense was unable to impeach Khoi himself as to his claim that appellant had shot him on March 11, 1995 (Counts 9 and 10), and instead the prosecution was able to use polished and experienced police officers to testify as to [Huynh's] prior

62

inconsistent statements on that point, meaning that the jury was unable to assess Khoi's demeanor and tone of voice when making his accusation." Defendant also argues that Huynh's claimed memory loss prevented defense counsel from developing the theory that "Khoi was a major participant in a Cheap Boys scheme to frame" defendant.

But it is speculative to suggest that the defense would have been better off if Huynh, rather than failing to identify defendant at trial, had actually identified defendant at trial, consistent with his statements to the police 10 days after the shooting. We do not believe it is reasonably probable that the opportunity to impeach such testimony by Huynh would have resulted in a different verdict. Huynh's inability to identify defendant as his assailant impeded defense counsel's frame-up theory, but at the same time, it directly weakened the prosecution's case that defendant was the person who shot Huynh.

Defendant also asserts he was prejudiced by Watkins's testimony. Tin Duc Phan allegedly told Watkins prior to trial that the Cheap Boys gang conspired to frame defendant. But at trial, Phan testified that he did not remember making any such statement. Defense counsel called Watkins to impeach Phan, and Watkins testified that Phan had told him that "the Cheap Boys are setting up Nip Family."

On cross-examination, the prosecutor asked Watkins whether he had "talk[ed] to anyone, intending or hoping that they would put pressure on Khoi Huynh not to testify." Watkins replied that he could not recollect having done so. He confirmed that he had attempted to speak with Huynh, but said he had not conducted an "in-depth interview" with him. When asked whether he had threatened Huynh by saying, "I'm telling other gang members that you're informing on a gang and cooperating with police," Watkins replied, "Have I ever gone to Khoi Huynh and said that? No, I have not." The prosecutor then moved on and did not revisit the subject.

63

Defendant contends that this testimony was "devastating to the defense" because it "destroyed" Watkins's credibility as a witness, thereby preventing him from effectively impeaching Phan's testimony, and "cast a pall of incredibility and deception over the entire defense team." This argument reads too much into Watkins's testimony. Although jurors might have found it suspicious that Watkins initially failed to affirmatively deny pressuring Huynh not to testify, the record does not support defendant's assertion that Watkins's "claim of lack of recall was an obvious falsehood" that "exposed [Watkins] as both a liar and a suppressor of evidence." Read in context, Watkins's responses were hardly "devastating," either to defense counsel's attempt to impeach Phan or to the defense team's overall credibility.

We also decline defendant's request that we remand the matter to the trial court "so that an appropriate inquiry may be undertaken into whether trial counsel had a conflict of interest in presenting the new trial motion, with appellant represented by new counsel at the inquiry." Citing *Wood v. Georgia* (1981) 450 U.S. 261, 273–274, defendant argues the trial court should have known that defense counsel was acting under a conflict of interest. The trial court considered this issue. The prosecutor reluctantly suggested that independent counsel be appointed to argue the motion for new trial. The trial court recognized that appointing independent counsel was "an option" but declined to do so, preferring to "take another look at that situation as things develop here on this hearing."

"When a defendant claims that a trial court's inquiry into a possible conflict was inadequate, the defendant still must demonstrate the impact of the conflict on counsel's performance." (*People v. Cornwell* (2005) 37 Cal.4th 50, 78, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "[C]ontrary to defendant's suggestion, the *Wood* decision certainly did not conclude that due process or Sixth Amendment principles require . . . an

64

automatic remand for further hearing whenever a trial court has not inquired sufficiently into a potential conflict of interest." (*Cornwell*, at p. 78.) Absent a demonstration of prejudice, we will not remand to the trial court for further inquiry. (*Ibid.*) Defendant fails to explain how the purported conflict affected defense counsel's presentation of the motion for a new trial. Thus, even assuming the trial court should have investigated further, defendant has not presented a sufficient basis for remand.

### 2. *Evidence of firearms*

Defendant contends that the trial court erred in admitting evidence of four firearms that were connected to defendant but were not connected to any of the charged shootings.

As noted, defendant was arrested on May 25, 1995, when he arrived with Huy Pham for a medical appointment with Dr. Dinh Van Dinh. Before trial, defendant moved to exclude evidence of a gun found in the glove compartment of Huy Pham's car on the grounds that "the probative value of finding the gun would be far outweighed by its prejudicial effect." Defendant alleged that "[t]he gun has no probative value since the defendant was not charged with possession of a concealed weapon on May 25, 1995. Further, the prosecution has not linked that weapon to any of the crimes charged in the information."

Defendant also noted in the motion to suppress evidence that several additional guns were found during a search of a residence at 13401 Amarillo Drive in Westminster. The police had obtained a search warrant after seeing three men of Asian descent, one of whom was roughly the same height as defendant, leave the residence and enter a car. When police stopped the car, the man who roughly matched defendant's height ran away and escaped. In some bushes near where the fleeing suspect was last seen, a police dog located a gun that had fired a bullet

recovered from the car Tuan Pham had been driving when he was killed. During the search, police found two .357-caliber pistols, a rifle resembling an AK-47, and prescriptions for Huy Pham and John Nguyen.

Following defendant's arrest, while he was being booked, he asked whether the police planned to book his friend, Huy Pham, adding: "Huy didn't do anything, and the gun is mine." The booking officer replied, "What gun?" Defendant said there was a loaded gun in the glove compartment of Huy Pham's car. Police retrieved the weapon.

Defendant argued in the suppression motion that "[t]here is no evidence that the guns belonged to the defendant or that he knew of their presence" and that "[s]ince none of the guns found have been linked to any of the counts alleged against the defendant, their probative value, if any, would be outweighed by their prejudicial effect and should be excluded."

On April 3, 1998, defendant filed an in limine motion to exclude evidence of the guns found in the search of the residence at 13401 Amarillo and the glove compartment of Huy Pham's car. The district attorney opposed the motion, arguing that evidence of the guns "is consistent with Lam Nguyen and Nip Family being armed and ready for a battle whenever and wherever it should occur." The prosecutor asserted that there was "an ongoing war . . . between the Nip Family and Cheap Boys gangs" and one would "expect the soldiers and the respective 'forts' to be heavily armed." The trial court denied defendant's motion, finding the evidence "relevant as to whether or not the defendant was an active participant and a member of a particular gang."

We held in *People v. Barnwell* (2007) 41 Cal.4th 1038 that it was error to admit evidence that the defendant possessed a gun that was not connected with the charged crime, "for such evidence tends to show not that he committed the crime,

66

but only that he is the sort of person who carries deadly weapons." (*Id.* at p. 1056.) The same is not true here.

To the extent defendant contends the evidence of the four guns was irrelevant and thus inadmissible, we reject the claim. "The trial court has broad latitude in determining the relevance of evidence. [Citations.] We review such determinations for abuse of discretion." (*People v. Scott* (2011) 52 Cal.4th 452, 490.) Here, as the Attorney General argued, evidence that defendant possessed numerous firearms had "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" (Evid. Code, § 210) namely, that he was a gang member at war with a rival gang. (See *People v. Hill* (2011) 191 Cal.App.4th 1104, 1122, fn. 9 [evidence of an ongoing gang war was relevant to show the defendant's motive for possessing firearm].)

To the extent defendant also contends the firearms evidence should have been excluded under Evidence Code section 352, the trial court did not abuse its discretion in admitting the evidence because its probative value was not outweighed by undue prejudicial effect. There was a significant amount of other evidence linking defendant to firearms. Defendant was identified as being in the back seat of the car when a fellow gang member shot Tony Nguyen. Chamroeun Choeun testified that defendant shot Huy Nguyen outside the Mission Control video arcade. Linda Vu testified that defendant shot and killed Sang Nguyen outside the Dong Khanh restaurant. Jeremy Lenart testified that defendant shot Khoi Huynh outside of the Rack and Cue pool hall. And Robert Wayne Murray picked defendant's photograph out of a lineup as the person who was holding a gun shortly before Tuan Pham was killed. The admission of evidence that defendant possessed other firearms not connected to the charged crimes was not unduly prejudicial.

67

*3. Issues related to the use of defendant's statements for impeachment*

Defendant argues that the trial court erred in permitting the prosecutor to impeach his testimony that he was not a member of the Nip Family gang with statements obtained from him following his arrest in violation of *Miranda v. Arizona* (1966) 384 U.S. 436. Defendant claims that there was a widespread police department policy to ignore suspects' invocation of the right to counsel in order to obtain statements for impeachment purposes, that the statements were involuntary, and that the statements were not limited to impeachment but were used for the truth of the matter asserted. Defendant argues that the admission of this evidence violated his Fifth Amendment right against self-incrimination, his Sixth Amendment right to the presence of counsel during police questioning, and the Fifth and Fourteenth Amendment ban on admission of involuntary statements.

Shortly after his arrest, defendant was brought to the Westminster police station and informed of his *Miranda* rights by Detectives Nye and Proctor. When defendant asked for an attorney, the interview stopped. But a few minutes later, police detectives reentered the interrogation room and resumed the questioning, telling defendant: "We just have to get some other things clear." During the questioning that followed, defendant admitted that he was a member of the Nip Family gang. After defendant reminded the detectives twice more that he wanted to speak with an attorney, the interview concluded.

At trial, the prosecution conceded that defendant's rights under *Miranda* had been violated and did not offer defendant's statements into evidence during its case-in-chief. Defendant testified on his own behalf at trial. He stated that he knew or was friends with many Nip Family gang members, but he denied being a member of the Nip Family gang. In rebuttal, the prosecution sought to introduce the contrary statements defendant made during his interrogation.

At a hearing outside the presence of the jury, Detective Nye testified he had learned at a training session taught by Devallis Rutledge of the Orange County District Attorney's Office that statements made by a suspect after he requests a lawyer cannot be used in the prosecution's case-in-chief but can be used for impeachment. Detective Nye stated that he had also watched about two dozen of Rutledge's training videotapes, though not all of the videos covered this particular topic. Detective Nye confirmed that he had learned — either in the live training or in one of Rutledge's videos — that "you can talk to a suspect after he invokes his right to an attorney in order to get statements for impeachment purposes." At one point, Detective Nye acknowledged that one reason he asked defendant about his gang affiliation after defendant had asked for an attorney was to get a statement for impeachment purposes, but he also asked as part of the booking process. A short time later, Detective Nye denied that he asked defendant about his gang affiliation for impeachment purposes, stating: "It was for personal knowledge about the gang, and his involvement. And it was also for the booking process."

After viewing the relevant portions of the videotape of the interrogation, the trial court permitted the prosecution to use defendant's statement for impeachment: "From the demeanor of the defendant and the demeanor of the two officers from the videotape that I have seen, I didn't see anything that was overbearing in terms of their conduct, or the way that they handled or processed the accused . . . ."

The high court in *Harris v. New York* (1971) 401 U.S. 222, 225 held that a defendant's out-of-court statements obtained in violation of *Miranda* could be used to impeach the defendant's testimony. *Harris* noted that a defendant does not have "the right to commit perjury" and said: "Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in

69

chief." (*Ibid.*) "The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." (*Id.* at p. 226.)

In *Oregon v. Hass* (1975) 420 U.S. 714, 723, the high court held that the rule in *Harris* applies even when the suspect has asked for an attorney following proper *Miranda* warnings. The high court recognized "that when proper *Miranda* warnings have been given, and the officer then continues his interrogation after the suspect asks for an attorney, the officer may be said to have little to lose and perhaps something to gain by way of possibly uncovering impeachment material." (*Ibid.*) But the court concluded that "the balance was struck in *Harris*, and we are not disposed to change it now. If, in a given case, the officer's conduct amounts to an abuse, that case, like those involving coercion or duress, may be taken care of when it arises measured by the traditional standards for evaluating voluntariness and trustworthiness." (*Ibid.*)

Against this backdrop, we have held that "the *Harris* rule applies when a police officer conducting a custodial interrogation *deliberately* fails to honor a suspect's request for counsel, with the *objective* of securing evidence for impeachment purposes." (*People v. Peevy* (1998) 17 Cal.4th 1184, 1188 (*Peevy*).) After Peevy was arrested, he was advised of his *Miranda* rights, and he asked for an attorney. The detective testified that he " 'kept talking with [the defendant] for impeachment purposes . . . . I just kept talking about the crime,' " explaining that he knew he was violating the dictates of *Miranda* but understood that the prosecution could still use the defendant's statements for impeachment. (*Id.* at p. 1189.) *Peevy* observed that the high court had "struck a balance between the need to deter police misconduct and the need to expose defendants who perjure themselves at trial." (*Id.* at p. 1194.) We said that "the *Harris* rule applies even if the individual police officer violates *Miranda* and *Edwards* [*v. Arizona* (1981) 451

70

U.S. 477] by purposefully failing to honor a suspect's invocation of his or her right to counsel," noting that "the court's concern that police misconduct not become a shield for perjury would seem to apply whether the misconduct is intentional or merely negligent." (*Id.* at p. 1196; see *People v. Demetrulias* (2006) 39 Cal.4th 1, 29.)

Under *Peevy*, the fact that Detective Nye deliberately violated the dictates of *Miranda* and continued the interrogation in order to obtain statements for impeachment did not preclude the prosecution from using those statements to impeach defendant's contrary testimony.

We left undecided in *Peevy* whether this court could or should create an exception to the rule permitting use of statements obtained in violation of *Miranda* and *Edwards* for impeachment if there was "widespread, systematic police misconduct" because Peevy had not preserved that issue for appeal. (*Peevy*, *supra*, 17 Cal.4th at p. 1205.) This case also does not require us to decide that issue because the record on direct appeal does not demonstrate widespread, systematic police misconduct.

Detective Nye testified that he learned from Rutledge, then a top official in the Orange County District Attorney's Office, that statements obtained in violation of *Miranda* could be used for impeachment and that he could continue to question a suspect even after the suspect invokes his right to an attorney. Further, the high court has observed that, "[e]mphasizing the impeachment exception to the *Miranda* rule approved by this Court, [citation], some training programs advise officers to omit *Miranda* warnings altogether or to continue questioning after the suspect invokes his rights." (*Missouri v. Seibert* (2004) 542 U.S. 600, 610, fn. 2 [citing a 1996 training videotape produced by the California Commission on Peace Officer Standards and Training]; see Weisselberg, *Saving* Miranda (1998) 84 Cornell L.Rev. 109, 189 [appendix quoting excerpts from a 1990 Devallis

71

Rutledge training video in which he discusses questioning suspects " 'outside *Miranda*' "].)

But the record on direct appeal does not show a widespread police practice of continuing to interrogate a suspect for impeachment purposes after he has asked for counsel. Although Detective Nye deliberately flouted *Miranda* and *Edwards* during defendant's interrogation, apparently employing a tactic he learned from Rutledge, we have before us no evidence that Detective Nye or other members of the Westminster Police Department employed such methods on a regular basis. Nor is there any allegation that Detective Nye acted pursuant to an official police department policy. (See *Peevy*, *supra*, 17 Cal.4th at p. 1205; *id.* at pp. 1213–1215 (conc. opn. of Mosk, J.) [arguing that the *Harris* and *Hass* exceptions should not extend to a "policy of a law enforcement agency to obtain statements from criminal suspects in violation of *Miranda*"].)

Nevertheless, we reiterate that *Miranda* and *Edwards* "imposed an affirmative duty upon interrogating officers to cease questioning once a suspect invokes the right to counsel." (*Peevy*, *supra*, 17 Cal.4th at p. 1202.) While holding that a statement obtained in violation of *Miranda* and *Edwards* may be used for impeachment, *Peevy* emphasized that "it is indeed police misconduct to interrogate a suspect in custody who has invoked the right to counsel." (*Peevy*, at p. 1205.) We reaffirm that principle today. "[N]othing in *Peevy* was meant to condone deliberately improper interrogation tactics, whether individual or systematic." (*People v. Neal* (2003) 31 Cal.4th 63, 90 (conc. opn. of Baxter, J.) (*Neal*).) "Such practices tarnish the badge most officers respect and honor." (*Id.* at p. 92.) Police officers should not misread *Peevy* as an invitation to ignore their obligations under *Miranda* and *Edwards*. Notwithstanding *Harris*'s and *Peevy*'s impeachment rule, a statement obtained in violation of *Miranda* and *Edwards* is a statement "obtained *illegally*." (*Peevy*, at p. 1204; see *id.* at pp. 1202–1203.)

Defendant additionally claims his statements were involuntary, citing *People v. Bey* (1993) 21 Cal.App.4th 1623. Bey was arrested and asked for an attorney when advised of his *Miranda* rights. The officer said he realized Bey did not waive his rights but explained he was going to continue to ask questions even though " 'we can't use 'em in court.' " (*Id*. at p. 1627.) Bey eventually gave "an account of the events on the night of the murder which was inconsistent in some respects with his testimony at trial." (*Ibid*.) The Court of Appeal ruled that Bey's statements were involuntary and could not be used to impeach his testimony, explaining: "This is a very troubling case, presenting a deliberate police violation of *Miranda* coupled with a misrepresentation to appellant about the legal consequences of that violation." (*Id*. at p. 1628.) Here, by contrast, Detective Nye did not mislead defendant into thinking that his statements could not be used in court.

This case also differs from *Neal*, *supra*, 31 Cal.4th 63, which held that statements obtained from a suspect after he had asked for an attorney could not be used for impeachment because the statements were involuntary. (*Id.* at p. 68.) There we said: "A statement is involuntary [citation] when, among other circumstances, it 'was " 'extracted by any sort of threats . . . , [or] obtained by any direct or implied promises, however slight . . . .' " ' [Citations.] Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the 'totality of [the] circumstances.' " (*Id.* at p. 79.) "In reviewing the trial court's determinations of voluntariness, we apply an independent standard of review, doing so 'in light of the record in its entirety, including "all the surrounding circumstances — both the characteristics of the accused and the details of the [encounter]". . . .' " (*Id*. at p. 80.) The interrogating officer in *Neal* not only had deliberately violated the dictates of *Miranda* but also had "badgered defendant, accusing him of lying," and kept him "in jail overnight without access to counsel

73

or other noncustodial personnel and without food or drink or toilet facilities." (*Id.* at p. 68.) This court also noted the defendant's youth, inexperience, minimal education, and low intelligence in finding his statements involuntary. (*Ibid.*)

Having reviewed the videotape of the interrogation, we agree with the trial court that Detective Nye's questioning was not overbearing or otherwise coercive. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 54, 58, 60 (*Coffman and Marlow*) [three-hour interrogation in violation of *Miranda* not coercive].) The record before us does not support defendant's claim that his statements were involuntary.

Next, defendant claims that the trial court erred in failing to instruct the jury that defendant's out-of-court statements were admissible only for purposes of impeachment. Defendant failed to request a limiting instruction, and the trial court had no obligation to issue one sua sponte. (*Coffman and Marlow*, *supra*, 34 Cal.4th at pp. 62–63.)

Finally, defendant argues that he was unconstitutionally precluded from fully developing the record because the trial court sustained "meritless objections" to defense counsel's questions about the training Detective Nye had received from the district attorney's office. Even assuming the trial court erred in sustaining some of these objections, defendant does not show that the trial court's rulings prevented him from developing the record on this point.

### 4. *Jury selection*

Defendant argues that the trial court's limitations on voir dire violated due process, his Sixth Amendment right to an impartial jury, and his Eighth Amendment right to a reliable penalty determination.

Defendant first asserts the trial court improperly limited voir dire by preventing him from asking prospective jurors whether they could vote for a

sentence of life without parole if they found defendant guilty of two or more first degree murders.  The record does not support defendant's claim.

"Prospective jurors may be excused for cause when their views on capital punishment would prevent or substantially impair the performance of their duties as jurors. [Citations.] . . . Thus, we have affirmed the principle that either party is entitled to ask prospective jurors questions that are specific enough to determine if those jurors harbor bias, as to some fact or circumstance shown by the trial evidence, that would cause them not to follow an instruction directing them to determine penalty after considering aggravating and mitigating evidence. [Citations.]  'Our decisions have explained that death-qualification voir dire must avoid two extremes.  On the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried.  On the other hand, it must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented.  [Citation.]  In deciding where to strike the balance in a particular case, trial courts have considerable discretion.' " (*Coffman and Marlow*, *supra*, 34 Cal.4th at pp. 46–47.)

At the beginning of jury selection, the court advised the prospective jurors that defendant was charged "with three separate counts of murder.  And if, and only if, the jury finds those charges to be true and further fixes the degree of the unlawful taking of life to be first degree murder, will we have a second part to the trial" at which the jury would select the penalty of either life imprisonment without possibility of parole or death.

Before individual voir dire began, the prospective jurors again were told that defendant was charged "with three separate homicides."  Regarding special circumstances, the court told the prospective jurors that "only if you find the

75

defendant guilty of more than two first degree murders . . . will you be asked to make the determination of do you find the special circumstances to be true. . . . Only if the jury finds the homicides to be first degree murder and you find the special circumstances to be true will there be need to do a second part in the trial. And the second part is called a penalty phase. [¶] In other words, you, the jury, are going to decide which of the two choices is the most appropriate penalty. [¶] And as we discussed earlier, one is life imprisonment without the possibility of parole, and the other is death."

During voir dire, defense counsel repeated that defendant was charged with three murders and added that "one of the special circumstances is if there is more than one first degree murder." Defense counsel was permitted to ask whether a prospective juror, during the penalty phase, "would be willing to look at all of the evidence that may be forthcoming from both sides that deal with the factors that you can consider in making a decision in that regard."

The record reflects that the prospective jurors understood that the penalty phase would occur only if defendant was found guilty of multiple murders:

"[Defense Counsel]: And do you understand in order to get into the [penalty phase] you are going to have to find Mr. Nguyen guilty of at least two if not three murders?

"A I understand, sir. . . .

"Q . . . [I]f you get to that part do you feel that your leaning toward the death penalty is such that this would make it difficult or substantially impair your ability to come back with a life decision — life without possibility of parole realizing that you don't even start the second phase until you have convicted Mr. Nguyen of two at least [if] not three?

"A Yes, I understand what you are saying."

76

The trial court permitted defense counsel to ask whether the next prospective juror understood that "in order to get to the second phase the jury's going to have to convict Mr. Nguyen of these two if not three first-degree murders." But the trial court interceded when defense counsel asked, "do you feel that you would be leaning towards the imposition of death by the time you found beyond a reasonable doubt that a person has been convicted of two separate first-degree murders?" The trial court expressed concern "that the question contains a prejudging of that factor by this juror." Defense counsel replied, "I can understand."

When asked about the death penalty by defense counsel, one prospective juror stated:

"[Prospective Juror]   Well, if I were to vote for death or life in prison without parole that means I found the guy guilty of at least two first-degree murders.

"[Defense Counsel]   That's correct[.]

"A   And then I would probably favor [the] death penalty in this case."

Defense counsel later returned to this topic in questioning the same prospective juror:

"[Defense Counsel]   And you understand before we get to the second stage of this proceeding you will have found Mr. Nguyen guilty of at least two premeditated murders. You understand that?

"A   I understand it. We may never get to this question.

"[¶] . . . . [¶]

"Q   And assuming that you got to that point where you found them beyond a reasonable doubt guilty of two first-degree murders with premeditation and based on your feelings death would be automatic?

77

"A   I feel that is a situation that I would listen to whatever instructions the judge gave on that, and I would base my decision on those instructions.

"[¶] . . . . [¶]

"Q   Tell me this:  would your feelings toward the death penalty substantially impair your ability to come back with a life without the possibility of parole verdict?

"A   I don't think so.  I think I can listen to the instructions and apply them."

The following day, before voir dire resumed, the court spoke to counsel in chambers to "go over some of the ground rules" to make sure that defense counsel's questions were "not putting the jurors in the position where they are prejudging the penalty phase or some aspect of the case."  The trial court noted that the commission of multiple murders would be one factor the jurors would consider during the penalty phase, adding:  "And I don't want them prejudging that.  [¶] So when you structure your question, if your point is will you still be willing to look at all the other factors . . . before you make a decision, that's an appropriate question."

Defense counsel asked the court what he was permitted to ask, and the court replied:  "All I'll permit is ladies and gentlemen, you can't get to the penalty phase unless the jury first finds the defendant guilty of the homicides that have been charged and finds the special circumstance to be true.  And recognizing that . . . will you be willing to look at evidence that may be forthcoming dealing with the defendant's background, his history, [and] other factors . . . ."

Even following the judge's admonition to counsel, defense counsel was permitted to ask whether a prospective juror understood that a penalty phase would occur only "if there is a conviction on a couple of — at least two if not three murders and you find the special-circumstance multiple-murder count to be

78

true." After affirming that the prospective juror had read in the juror questionnaire a list of factors that could be considered during the penalty phase, defense counsel asked whether there were "any particular factor[s] in there that you feel . . . are less significant than others." The trial court did not permit the prospective juror to answer because "[i]t might put the juror in the position of prejudging the case" and suggested instead that defense counsel ask jurors: "Are they willing to look at each one of those factors if evidence is presented?"

On this record, we conclude that the trial court did not abuse its discretion in its effort to strike an appropriate balance between the " 'two extremes' " of failing " 'to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors' " and asking " 'the prospective jurors to prejudge the penalty issue.' " (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 47; see *People v. Pearson* (2013) 56 Cal.4th 393, 413 ["counsel are not entitled to indoctrinate the jurors as to a particular view of the facts and ask whether they would cause him or her to vote for a specific penalty"].)

Defendant next argues that the trial court erred in not permitting defense counsel to ask prospective jurors about their views on the sentence of life in prison without possibility of parole. Before trial, defendant filed a motion to distribute a questionnaire to prospective jurors, explaining that it would "promote judicial economy by expediting the jury selection process." In a section titled "Attitudes Regarding the Death Penalty," defendant proposed asking the prospective jurors, among other things, to state their "general feeling regarding the death penalty" and their "general feelings regarding life imprisonment without the possibility of parole." The proposed questionnaire also asked the prospective jurors: "Do you believe that Life without the possibility of parole actually means a life sentence without the possibility of parole?" The prosecutor proposed her own version of

79

the questionnaire, and the court drafted the final version, which was accepted by both parties.

The final version of the questionnaire explained that if the jury reached the penalty phase, "[t]he only two sentencing choices that you would have would be 1) life in prison without the possibility of parole, or 2) death." It did not include the three questions quoted above but did ask the prospective jurors to indicate in their responses whether their "individual beliefs are such that you could not follow the law, or your conscientious beliefs concerning the killing of another or your beliefs about capital punishment would substantially or automatically preclude your full consideration of the evidence or the law in the penalty phase." The questionnaire asked whether the prospective jurors would refuse either to find defendant guilty of first degree murder or to find true the special circumstance allegation to prevent the penalty phase from taking place, whether their views concerning capital punishment would cause them to automatically vote for or against the death penalty or life without possibility of parole, and whether they could follow the court's instructions to consider aggravating and mitigating factors before voting on the penalty. The questionnaire also asked prospective jurors to list the reasons they "either support the death penalty or are opposed to it," whether they had "any religious convictions or views regarding the death penalty," and whether, despite their personal views, they could follow the court's instructions. The questionnaire did not specifically ask jurors to provide their views about life without possibility of parole.

One prospective juror, P.C., wrote on the questionnaire form that she supported the death penalty because "[l]ife imprisonment usually results in parole." Defendant asserts that P.C.'s written response "reflect[s] a common misunderstanding of life without parole" that defense counsel was entitled to explore during voir dire.

80

During individual voir dire, defense counsel asked whether a prospective juror other than P.C. thought "that if someone is sentenced to life without possibility of parole, that at some time they're going to get paroled?" The court sustained the prosecutor's objection. Defense counsel then asked: "What is your feeling about someone who is sentenced to life without possibility of parole? What is your view about that? Is that a harsh penalty in your view?" The court interrupted, brought counsel to the bench, and explained that "these kinds of questions are inappropriate in view of the fact that we used the questionnaire. . . . As to the first question, there's been a recent California Supreme Court case that has expressly said that it's wrong for the judge to tell the jury that life imprisonment without the possibility of parole means just that. So that's why I sustained the objection to that form of the question. [¶] As to the second, where you're at now is going to get them talking about things that are in the questionnaire, and the reason I allowed the questionnaire was to save time." The court explained that the questionnaires were "sufficient and adequate to feather out their — any strong biases or prejudices in either direction."

Defendant is correct that a juror's mistaken belief that a sentence of life imprisonment without the possibility of parole may result in parole could substantially impair that juror's ability to follow the law if the juror's mistaken belief was so strongly held that it would impair his or her ability to follow the court's instructions. Under California's capital sentencing scheme, the jury "shall determine whether the penalty shall be death or confinement in state prison for a term of life without the possibility of parole. . . . [¶] . . . [¶] . . . If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole." (§ 190.3.) If a juror believes that life without possibility of parole in fact allows parole — and for that

81

reason regards that sentence as an inadequate alternative to the death penalty in a particular case — that juror would have labored under "a false choice between sentencing [the defendant] to death and sentencing him to a limited period of incarceration." (*Simmons v. South Carolina* (1994) 512 U.S. 154, 161.)  In other words, a mistaken belief that the alternative to death is more lenient than the law actually provides may improperly bias that juror's penalty determination in favor of death.

Defendant is also correct that our cases on penalty phase jury instructions are not entirely apposite in the jury selection context.  We have said that if the jury raises the prospect of commutation, the trial court must make " 'a short statement indicating that the Governor's commutation power applies to both [death and life without possibility of parole] but emphasizing that it would be a violation of the juror's duty to consider the possibility of such commutation in determining the appropriate sentence.' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 203–204 (*Letner*).)  But, as defendant recognizes, he was not entitled to an instruction informing the jury that if it chose life without possibility of parole, he would never be released from prison.  (*People v. Arias* (1996) 13 Cal.4th 92, 172 (*Arias*).)  Nor was he entitled to an instruction that the jury should " 'assume' or 'presume' that the sentence will be carried out." (*Letner*, at p. 206.)  We have explained that "to instruct the jury that it must assume that a sentence of life without the possibility of parole means the defendant will be imprisoned for the rest of his or her life is inaccurate because it fails to acknowledge that the Governor retains the power of commutation." (*People v. Williams* (2008) 43 Cal.4th 584, 647.)

However, as defendant observes, a juror who believes a sentence of life without parole may be commuted is qualitatively different from a juror who believes a defendant sentenced to "life without the possibility of parole" (§ 190.3) is eligible for parole under that sentence.  The first belief is based on the

possibility, however remote, that the sentence could lawfully be reduced at some point in the future. By contrast, the second belief reflects a misunderstanding of the law or an inability to accept or follow the law. Although the Legislature, through future legislation, could introduce parole eligibility for inmates now sentenced to life without the possibility of parole, it is a mistake of law to believe that the sentence of "life without the possibility of parole" currently prescribed by section 190.3 allows for parole. Because the standard penalty phase instructions do not elaborate on the meaning of life without possibility of parole (CALJIC Nos. 8.84, 8.88; CALCRIM Nos. 760–761), and because precedent circumscribes a capital defendant's right to alternative instructions (*Arias*, *supra*, 13 Cal.4th at p. 172; *Letner*, *supra*, 50 Cal.4th at p. 206), jury instructions are unlikely to correct the latter type of mistaken belief.

It is settled that a capital defendant is entitled to use voir dire to identify and excuse prospective jurors who would automatically vote in favor of death. (*Morgan v. Illinois* (1992) 504 U.S. 719, 735–736.) Here defendant contends he was entitled to use voir dire to explore whether a prospective juror's beliefs about life without the possibility of parole would impair that juror's ability to apply the sentencing framework set forth in California law. To support this contention, defendant's briefing on appeal cites studies showing that this mistaken belief is common and prejudicial. However, defense counsel did not bring such evidence to the trial court's attention or otherwise demonstrate the need to subject all prospective jurors to voir dire on this issue. Accordingly, the trial court did not abuse its discretion in limiting voir dire on the ground that the responses provided by prospective jurors on their questionnaires were sufficient to determine whether their views about life without possibility of parole would prevent them from following the law. (Code Civ. Proc., § 223 ["The court may, in the exercise of its

83

discretion, limit the oral and direct questioning of prospective jurors by counsel."].)

Moreover, there was no need for voir dire specifically to ascertain Prospective Juror P.C.'s views about life without possibility of parole because her other questionnaire responses made clear that she was not qualified to serve on a capital jury. She responded "Yes" to the question whether she would "<u>automatically refuse</u> to vote in favor of the penalty of life imprisonment without the possibility of parole and <u>automatically vote</u> for a penalty of death, without considering any of the evidence, or any of the aggravating and mitigating factors." P.C. also checked the "No" box in response to the question about being able to "set aside your personal feelings and follow the law as the Court explains it." These responses gave defense counsel an independent basis to question P.C. during voir dire and, if she confirmed her inability to follow the law, to challenge her for cause.

Relying on *People v. Stewart* (2004) 33 Cal.4th 425, defendant argues that the trial court erred by "refus[ing] to allow oral voir dire when the juror questionnaires did not provide an adequate basis for determining whether the jurors were able to serve without substantial impairment." *Stewart* does not support defendant's argument that the trial court in this case improperly limited voir dire. *Stewart* held that the trial court erred in excusing potentially qualified prospective jurors for cause based solely on ambiguous answers to questions in a questionnaire. (*Id.* at pp. 448–450.) The trial court in *Stewart* excused five jurors over the defendant's objection, so it was clear which jurors the defendant wanted to retain. Here, by contrast, P.C. — the only prospective juror who squarely indicated a misunderstanding of life without possibility of parole — was not seated on the jury. The record suggests she was excused for unrelated reasons before the start of individual voir dire. Defendant does not identify any specific

jurors who were improperly retained despite an ambiguous questionnaire response. In these circumstances, we find no abuse of discretion in the trial court's limitation of voir dire.

### III.   PENALTY PHASE ISSUES

#### A.  Prison Conditions

Defendant argues that the trial court erred during the penalty phase by excluding expert testimony "about the prison conditions to which life-without-parole inmates were subject," statistics regarding the unlikelihood that the Governor would commute a life-without-parole prison sentence, and "the socially useful work that appellant could do while a prisoner serving" a life sentence.

"As defendant acknowledges, we have repeatedly held that evidence concerning conditions of confinement for a person serving a sentence of life without possibility of parole is not relevant to the penalty determination because it has no bearing on the defendant's character, culpability, or the circumstances of the offense under either the federal Constitution or section 190.3, factor (k)." (*People v. Martinez* (2010) 47 Cal.4th 911, 963; *People v. Thompson* (1988) 45 Cal.3d 86, 138–139 (*Thompson*).)  "More importantly, '[d]escribing future conditions of confinement for a person serving life without possibility of parole involves speculation as to what future officials in another branch of government will or will not do.' [Citation.] The evidence defendant sought to admit assumed that the specific security measures of daily prison life would remain unchanged throughout his supposed life sentence."  (*Martinez*, at p. 963.)

Nor did the trial court err in excluding testimony concerning statistics regarding how unlikely it was that a prisoner sentenced to life without parole "would ever be presented to the Governor for parole consideration via commutation."  We recognized in *Thompson* that the jury should not be invited to

85

speculate on whether a defendant's sentence of life without possibility of parole might be commuted. (*Thompson*, *supra*, 45 Cal.3d at p. 130.)

As to "the socially useful work that appellant could do while a prisoner serving" a life sentence, the record does not reflect that the trial court precluded the expert witness from testifying to such matters. After the trial court ruled that the expert witness would not be permitted to testify concerning the conditions of confinement, the prosecutor clarified that she did not object to the expert testifying that defendant "would be a peaceful individual in prison," which in our view could encompass testimony on opportunities for defendant to do socially useful work in prison. The trial court agreed that the expert witness would be permitted to "take the stand and give an opinion on it," adding that whether to do so was "a tactical decision made by counsel and defendant whether they want to pursue that topic." Defense counsel replied, "No, I'm not doing it."

## B. Defense Counsel's Argument

Defendant argues that the trial court unconstitutionally limited defense counsel's argument to the penalty phase jury by precluding comment on the conditions of confinement of a prisoner serving a sentence of life without possibility of parole.

Following the trial court's ruling excluding expert testimony about prison conditions, defense counsel asked if he could "make reference to that in final closing argument." The trial court answered, "No." During closing argument, defense counsel told the jury that "by your verdict, you've confined him to live in a six by eight cell surrounded by brick and a metal door for the rest of his life." The trial court sustained the prosecutor's objection. Defense counsel then rephrased his comment and said, without objection: "Life without possibility of

86

parole means for the rest of Lam Nguyen's natural life he is going to be locked up in prison."

Defendant argues that the trial court erred because "[e]ven the cases that have upheld the exclusion of evidence with respect to the nature of an LWOP sentence do explicitly authorize defense counsel to argue that matter to the jury." Defendant was not denied the opportunity to argue the matter. In *Thompson*, we stated in dicta that "[d]efense counsel's remarks to the jury during closing argument as to what life without possibility of parole would really mean and what an unending punishment it would be were . . . within the scope of legitimate argument to the extent the remarks impressed on the jury the gravity of its task." (*Thompson*, *supra*, 45 Cal.3d at p. 131, fn. 29; see *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1159–1160 [defense counsel's argument could characterize "the full nature of a sentence of life in prison without the possibility of parole"]; *People v. Daniels* (1991) 52 Cal.3d 815, 877-878 [defense counsel's "interest in telling the jurors of . . . the rigors of confinement in order to impress upon them the gravity of their responsibility . . . could be satisfied in his argument."].)

In the instant case, defense counsel was permitted to convey to the jury the severity of a sentence of life without parole to "impress upon the jury the gravity of its task" by telling the jurors that "[l]ife without possibility of parole means for the rest of Lam Nguyen's natural life he is going to be locked up in prison." (See *Thompson, supra,* 45 Cal.3d at p. 131, fn. 29.) The trial court did not abuse its discretion in precluding defense counsel's attempt to describe the precise measurements and features of the cell in which defendant would serve his sentence, a matter on which the defense had proffered no evidence.

The trial court properly denied defense counsel's request "to comment on other cases that are reasonably well known where LWOP was imposed." As defendant acknowledges: " 'On numerous occasions, we have upheld a trial

court's refusal "to allow defense counsel to compare the subject crime to other well-known murders" [citation], or to note the penalty imposed in such cases . . . .' " (*People v. Virgil* (2011) 51 Cal.4th 1210, 1285, quoting *People v. Farley* (2009) 46 Cal.4th 1053, 1130.)

### C. Lingering Doubt

Defendant argues that the trial court gave conflicting instructions on lingering doubt to two alternate jurors who were substituted into the jury at the beginning of the penalty phase. The instructions to the jury at the end of the penalty phase included the following: "The defendant in this case has been found guilty of two counts of murder of the first degree. The allegation that the murder was committed under a special circumstance has been specially found to be true. . . . *Alternate jurors who have now been placed as jurors during this phase of the trial must accept the guilt phase verdicts and findings during deliberations on the appropriate penalty.* The jury should not consider or discuss either the deterrent effects of capital punishment or the cost of either penalty. If evidence of any mitigating circumstance or evidence of any aspect of the defendant's background or his character arouses sympathy, empathy or compassion, you may consider that in determining the appropriate penalty. *If you have any lingering doubts after full consideration of the evidence presented during the guilt phase as to the guilt of the defendant or as to the degree of culpability on the part of the defendant, you may consider that lingering doubt in making your determination as to which penalty is appropriate.*"

Defendant argues that "[t]here is at least a reasonable likelihood that the former alternate jurors would have seen these two instructions as inconsistent." The challenged instructions in this case are similar to the jury instructions upheld in *People v. Cain* (1995) 10 Cal.4th 1. Like the instructions in *Cain*, the

instructions here required the new jurors to accept that the findings in the guilt phase "were made beyond a reasonable doubt." (*Id.* at p. 66.) The instructions "did not purport to limit the guilt phase *evidence* that could be considered by the jury, whether in assessing the circumstances of the crime (§ 190.3, factor (a)) or in considering the existence of lingering doubt." (*Ibid.*, fn. omitted.) There is no reason to think that the jurors would have interpreted the instructions to permit only the original jurors, and not the former alternate jurors, to consider lingering doubt. "An instruction that allows the jurors to vote against the death penalty phase if they have residual doubt as to guilt or truth of the special circumstances is sufficient even though it requires the jurors to accept the guilt phase verdicts." (*Id.* at p. 67.)

### D. Judicial Elections

Defendant claims that his constitutional rights to due process and a fair trial were violated and are being violated because the trial court judge was, and the justices of this court are, subject to judicial elections. Defendant maintains that judges who are subject to election cannot be impartial because they might be removed from office if they rule in favor of a capital defendant.

Defendant cites *Tumey v. Ohio* (1927) 273 U.S. 510, 515–517, which reversed a conviction for possessing intoxicating liquor under the Ohio Prohibition Act because the trial was conducted by the mayor of the village. A local ordinance provided that the village would receive half of the $100 fine collected from the defendant and the mayor would "receive or retain the amount of his costs in each case, in addition to his regular salary, as compensation for hearing such cases." (*Id.* at p. 519.) The high court recognized "[t]hat officers acting in a judicial or quasi-judicial capacity are disqualified by their interest in the controversy to be decided . . . ." (*Id.* at p. 522.) The high court noted that the fact

89

that judges are also taxpayers who would indirectly benefit from the collection of fines is not enough to disqualify them because "the circumstance that there is no judge not equally disqualified to act in such a case had been held to affect the question." (*Ibid*.) However, disqualification certainly is required if the judge "has a direct, personal, substantial pecuniary interest in reaching a conclusion against [the defendant] in his case." (*Id*. at p. 523.) Here, any interest stemming from judicial elections is indirect and nonpecuniary, and affects all California judges equally.

Defendant also relies upon *Caperton v. A.T. Massey Coal Co.* (2009) 556 U.S. 868, 873, which held that a justice of the West Virginia Supreme Court of Appeals should have recused himself from an appeal from a $50 million verdict against a coal company because the board chairman of the coal company had contributed $3 million to support the justice's election. The high court observed: "The proper constitutional inquiry is 'whether sitting on the case . . . " 'would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true.' " ' [Citations.] 'What degree or kind of interest is sufficient to disqualify a judge from sitting "cannot be defined with precision." ' " (*Id*. at p. 879.) The high court noted that each case that had held that a judge must be recused on this basis "dealt with extreme facts that created an unconstitutional probability of bias." (*Id*. at p. 887.) No such extreme facts demonstrating a denial of due process are present here.

### E.  Challenges to the Death Penalty Statutes

Defendant summarily raises numerous challenges to California's death penalty scheme that, as defendant notes, this court has repeatedly considered and rejected. Defendant asks that we reconsider these rulings but provides no persuasive reason for doing so. We restate the applicable rulings here.

"Section 190.3, factor (a), which permits the jury to consider the circumstances of the crime in deciding whether to impose the death penalty, does not license the arbitrary and capricious imposition of the death penalty." (*People v. Nelson* (2011) 51 Cal.4th 198, 225 (*Nelson*).) "Nothing in the federal Constitution requires the penalty phase jury to make written findings of the factors it finds in aggravation and mitigation; agree unanimously that a particular aggravating circumstance exists; find all aggravating factors proved beyond a reasonable doubt or by a preponderance of the evidence; find that aggravation outweighs mitigation beyond a reasonable doubt; or conclude beyond a reasonable doubt that death is the appropriate penalty." (*Ibid.*)

"The jury may properly consider unadjudicated criminal activity at the penalty phase and need not make a unanimous finding on each instance of such activity." (*Nelson*, *supra*, 51 Cal.4th at p. 226.) The trial court is not required to instruct the penalty phase jurors that "they may not consider acts of prior unadjudicated criminality as an aggravating circumstance unless they unanimously find that defendant committed those criminal acts [citation]." (*People v. Valdez* (2012) 55 Cal.4th 82, 179.)

"The use of the same jury for the guilt and penalty phases does not deprive defendant of an impartial and unbiased jury." (*People v. Thomas* (2012) 53 Cal.4th 771, 836 (*Thomas*).)

Instructing the penalty phase jurors that they could consider the facts underlying defendant's prior conviction of assault did not place defendant in jeopardy a second time. (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 134–135, vacated on other grounds in *Bacigalupo v. California* (1992) 506 U.S. 802.)

Section 190.3, factor (i), which permits the jurors to consider defendant's age in determining the appropriate penalty, is not unconstitutionally vague. (*Thomas*, *supra*, 53 Cal.4th at p. 833.)

91

The trial court was not required to delete from the instructions arguably inapplicable sentencing factors. (*Thomas*, *supra*, 53 Cal.4th at pp. 832–833.) Sentencing factors such as those in section 190.3, factor (a) (the circumstances of the crime) and factor (k) (any other circumstances that extenuates the gravity of the crime) are not unduly vague. (*People v. Tully* (2012) 54 Cal.4th 952, 1067, 1069 (*Tully*).) "Including in the penalty phase instruction's list of potential mitigating factors adjectives such as 'extreme' (§ 190.3, factors (d), (g)) and 'substantial' (*id.*, factor (g)) does not erect an impermissible barrier to the jury's consideration of mitigating evidence." (*People v. Manibusan* (2013) 58 Cal.4th 40, 100 (*Manibusan*).) Nor was the trial court required to specify in the jury instructions a burden of proof in selecting the appropriate penalty. (*Tully*, *supra*, 54 Cal.4th at p. 1068.)

" 'California's death penalty law "adequately narrows the class of murderers subject to the death penalty" and does not violate the Eighth Amendment.' " (*Tully*, *supra*, 54 Cal.4th at p. 1067.)

"There is no need to instruct the jury that . . . if the mitigating evidence outweighs the aggravating evidence, the jury must impose a sentence of life without the possibility of parole." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 150.)

"The penalty phase instructions were not impermissibly broad or vague in directing jurors to determine whether the aggravating factors were ' " 'so substantial in comparison with the mitigating factors that it warrants death instead of life without parole.' " ' " (*Manibusan*, *supra*, 58 Cal.4th at p. 100.)

Review for intercase proportionality is not constitutionally compelled. (*Pulley v. Harris* (1984) 465 U.S. 37, 42, 50–51; *People v. Contreras* (2013) 58 Cal.4th 123, 173.) And because capital defendants are not similarly situated to noncapital defendants, California's death penalty law does not deny capital defendants equal protection by providing certain procedural protections to

92

noncapital defendants but not to capital defendants. (*Contreras*, at p. 173; *People v. Jennings* (2010) 50 Cal.4th 616, 690.) Nor is the death penalty as applied in this state rendered unconstitutional through operation of international law and treaties. (*Tully*, *supra*, 54 Cal.4th at p. 1070.)

"The death penalty is not inherently cruel or unusual punishment." (*Manibusan*, *supra*, 58 Cal.4th at p. 100.)

Finally, we reject defendant's claim that the cumulative impact of the deficiencies he has alleged renders California's death penalty law constitutionally infirm. We have individually rejected each of defendant's challenges to California's death penalty law, and "[s]uch claims are no more compelling . . . when considered together . . . ." (*People v. Garcia* (2011) 52 Cal.4th 706, 765.)

## F. Cumulative Prejudice

"Defendant contends the cumulative effect of guilt and penalty phase errors requires reversal of his death sentence. We disagree. To the extent we concluded or assumed that the trial court erred, no single error warranted reversal, and we are not persuaded that reversal is warranted when those same nonprejudicial errors are considered collectively." (*Nelson*, *supra*, 51 Cal.4th at pp. 224–225.)

## G. Ineffective Assistance of Counsel

Defendant provisionally argues that if this court rules that defendant failed to preserve any of the foregoing claims for review, defense counsel would have provided ineffective assistance of counsel. But this court has not so ruled.

93

## CONCLUSION

We strike the sentence enhancements under Penal Code section 186.22, subdivision (b)(1) from the sentences imposed for actively participating in a gang in counts 3, 5, 7, 10, and 14.  In all other respects, the judgment is affirmed.


**LIU, J.**


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**KRUGER, J.**

**CONCURRING AND DISSENTING OPINION BY CUÉLLAR, J.**

By their very nature, capital appeals raise issues that our court has no choice but to address. After closely considering defendant's conviction for aiding and abetting the attempted murder of Tony Nguyen, I do not believe that conviction can stand. Accordingly, I respectfully dissent from that portion of the court's opinion.

To be guilty of aiding and abetting, a defendant must, " 'by act or advice,' " aid, promote, encourage, or instigate the commission of a crime. (*People v. Marshall* (1997) 15 Cal.4th 1, 40.) The defendant must act both with knowledge of the principal's unlawful purpose and with " 'the intent or purpose of committing, encouraging, or facilitating the commission of the offense.' " (*Ibid.*) In the case of aiding and abetting the offense of attempted murder, the defendant must specifically intend to kill. (*People v. Lee* (2003) 31 Cal.4th 613, 624 ["[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing — which means that the person guilty of attempted murder as an aider and abettor must intend to kill"]; *People v. Beeman* (1984) 35 Cal.3d 547, 560 ["When the definition of the offense includes the intent to do some act or achieve some consequence beyond the *actus reus* of the crime [citation], the aider and abettor must share the specific intent of the perpetrator"].) Although presence at the scene

1

of the crime is one relevant factor a jury may consider in determining whether a defendant is guilty of aiding and abetting, presence alone is insufficient to sustain a conviction.  (See, e.g., *People v. Durham* (1969) 70 Cal.2d 171, 181; *People v. Villa* (1957) 156 Cal.App.2d 128, 133-134.)  Neither is it sufficient for a defendant, subsequent to the perpetration of the offense, to desire that the victim die; the intent to aid in the offense "must be formed *prior to or during* 'commission' of that offense." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164 (*Cooper*).)

The evidence of what took place at the time Tony Nguyen was shot is extraordinarily thin.  As the majority recounts, defendant was seated in the back of a car driven by My Tran.  Nghia Phan sat in the front passenger seat.  At some point, the car began to follow a car driven by Tony Nguyen and occupied by several other members of the Cheap Boys gang.  Tran's car passed Tony's car, and Vinh Kevin Lac, one of the occupants of Tony's car, testified that defendant stared back at Tony's car as the two cars passed.  Tran's car then pulled into the parking lot of a fast food restaurant, idled there until Tony's car passed by, and then pulled out of the lot to follow Tony's car.  The two cars stopped next to each other at a red light.  When the signal turned green, Phan shot Tony in the neck before Tran's car pulled away.  Several days after the shooting, defendant visited Lac's apartment and asked, "What's up with the cops?"

Had the prosecution been limited to the evidence described above, we would undoubtedly conclude that there was insufficient evidence to convict defendant of aiding and abetting attempted murder.  The evidence specific to Tony Nguyen's shooting showed that defendant was present in the car from which Tony was shot, that defendant was accompanied by fellow gang members, and that defendant "stared" at Tony's car prior to the shooting.  While the car's driver arguably "stalked" Tony's car prior to the shooting, defendant was not the driver

2

and no other evidence demonstrated that defendant was complicit in or even aware of the nature of the car's maneuvers immediately before the shooting.  And while defendant spoke to Lac several days after the shooting to ask, "What's up with the cops?", the interaction fails to elucidate defendant's knowledge of or intent to aid in the commission of the shooting *when it occurred*.  (See *Cooper*, *supra*, 53 Cal.3d at p. 1164.)

So the incident-specific evidence above sheds minimal light on what action, if any, defendant took to aid, promote, encourage, or instigate Tony Nguyen's shooting.  It sheds even less light on whether defendant specifically intended Tony's death.  Indeed, I do not understand the majority to contend that defendant's conviction for aiding and abetting the attempted murder of Tony Nguyen can be sustained based solely on the evidence specific to the shooting itself.

With so little evidence specific to the Tony Nguyen shooting supporting defendant's conviction for attempted murder, the prosecution was left to rely on Detective Mark Nye's gang expert testimony.  This is problematic given the limits of what little can be gleaned from it.  Nye's testimony was remarkably broad, and almost none of it pertained specifically to defendant, the Nip Family, or even Vietnamese gangs.  In fact, Nye's sole discussion of either defendant or the Nip Family was limited to a brief confirmation that he was familiar with defendant and believed him to be a member of the Nip Family, a similarly brief account of the origins of the Nip Family (which was an outgrowth of another Vietnamese gang, the Natoma Boys), and an opinion that the Nip Family was in a war with the Cheap Boys at the time of the shootings in this case.[1]

---

[1]     Nye also recounted his role in securing defendant's arrest.

Rather than focusing on any facts specific to defendant or even the Nip Family, Nye testified about the culture and behavioral patterns of "Asian" gangs in general. Nye contrasted Asian gangs with Hispanic ones, at one point concluding that Asian gangs are "a lot more intelligent, more sophisticated" than their Hispanic counterparts. Nye also testified that, relative to "turf-oriented" Hispanic gangs that "prey upon people that live in their community," Asian gangs' "way of doing business" is to get "involved in street warfare wherever they happen to be at that particular time." The assertion that Asian gang members are ready, willing, and able to violently confront rival gang members in any place at any moment turned out to be a theme in Nye's testimony. He opined: "If they encounter their rivals, they're going to have a shooting right there. They're going to have gang warfare right there on the streets." Later on, Nye responded affirmatively when asked whether members of two Asian gangs that had reached a stage of gang warfare "would be trying to kill whoever was in the other gang" whenever there was an opportunity. Nye also claimed that "as part of their very culture, [Asian gangs are] expecting a battle to occur at any time."

Adding to this picture of Asian gangs as being prepared to engage in violent confrontation everywhere at all times was Nye's repeated assertion that Asian gangs "hunt" their rivals. According to Nye, every time multiple Asian gang members go out together, "they actively look for rival gang members." Nye testified that the gangs "are extremely mobile and they go from place to place around the community hunting for their rivals." "Every time they go in the car, they're ready for engagement with another gang. They're ready and they anticipate confronting rivals."

Finally, Nye portrayed Asian gangs as highly cohesive groups in which each and every member has a clear understanding of and commitment to the rules and goals of the gang. Characterizing an Asian gang as "an octopus with many

4

legs," Nye opined that the rules of gang membership require each gang member to act as "backup" for his fellow gang members during a confrontation. Thus, a gang member who was merely present in a car during a shooting could be acting as backup, because "[i]f something were to happen and they would have to bail out of the car, that member would be expected to back that person up. Be it assault somebody, be it shoot somebody, be it take over the driving of the vehicle, whatever it may be. He is going to be expected to back up the individuals." Nye testified that the gang members "act[] in concert as a group," during confrontations with rival gangs, and that even an individual who does not personally shoot during these confrontations acts as backup because he is "expected to do everything that [the shooter] is going to do," and "needs to be just as aggressive as the other person."

The effect of Nye's testimony was to paint a static picture of Asian gang members — and, by implication, defendant — as always and everywhere actively seeking violent confrontation. This picture, which contained no allowance for variation among individuals' intentions or motivations, or ebbs and flows in a gang's appetite for violence, was overbroad and simplistic on its face. And ironically, it was actually contradicted by some of the evidence specific to the Tony Nguyen shooting. Nye's repeated, unqualified claim that rival gang members engaged in a gang war would violently attack one another at *any* opportunity, stands in stark contrast to Kevin Lac's acknowledgement that he lived in the same apartment building as defendant and had "bumped into him, kind of, you know, five, six times." On none of these occasions did the interaction result in violence, in spite of the fact that defendant was aware that Lac belonged to the Cheap Boys. Moreover, defendant was apparently able to put aside his violent intentions long enough to peacefully ask Lac, "What's up with the cops?" following the Tony Nguyen shooting. Such inconsistencies between Nye's

5

testimony and the facts surrounding the Tony Nguyen shooting did not necessarily render Nye's testimony inadmissible, but previous cases have found that gang expert testimony is of limited probative value when it is contradicted by the facts of the case. (E.g., *People v. Rios* (2013) 222 Cal.App.4th 542, 574 [gang expert's testimony that possession of a stolen vehicle could further or assist a gang's criminal activities because a stolen vehicle could be used to evade law enforcement or commit drive-by shootings was insufficient to sustain gang enhancement under Pen. Code, § 186.22, subd. (b), when there was no evidence that defendant used the stolen vehicle for any of these purposes]; *In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1363-1364 [gang expert's testimony was insufficient to sustain conviction when the "underlying premise" of the expert's opinion was "factually incorrect"].)

Contradictions aside, the probative value of Nye's testimony was undercut further by its generality. Not only did Nye's testimony include very little evidence about the Nip Family in particular, but Nye's broad observations about the general culture of "Asian" gangs does not, in and of itself, prove what defendant's actions and intentions were with respect to any given incident. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1179 [while an opinion about gang members' knowledge of their associates' intentions "may generally be true regarding gang culture, it is still speculative in its application to the specific conduct of gang members in a particular case"].) No human being acts in all instances as even a carefully drawn portrait of his cultural affiliation would predict. Nor is it safe simply to assume that even the most fiercely loyal adherents of a group share that association's goals or intentions at all times. To conclude otherwise, and thus find a defendant guilty based almost entirely on the assumption that he *must* have been acting in accord with his group's rules and culture on any particular occasion, effectively punishes a defendant based on the mere fact of gang membership —

6

something clearly disallowed.  (See *People v. Guillen* (2014) 227 Cal.App.4th 934, 992 ["[G]ang evidence standing alone cannot prove a defendant is an aider and abettor to a crime"]; *United States v. Garcia* (9th Cir. 1998) 151 F.3d 1243, 1246 ["[E]vidence of gang membership cannot itself prove that an individual has entered a criminal agreement to attack members of rival gangs"]; *In re Wing Y.* (1977) 67 Cal.App.3d 69, 79 [defendant's gang membership is inadmissible when it serves no evidentiary function other than to allow "*unreasonable* inferences . . . that [defendant] [is] guilty of the offense charged on the theory of 'guilt by association' "]; cf. *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 ["Mere active and knowing participation in a criminal street gang is not a crime"].)  It is true that many gang members indeed commit violent or other serious criminal offenses, and such activity is subject to severe punishment under our criminal statutes.  (See Pen. Code, § 186.22, subd. (b).)  But we remain responsible for determining whether any given conviction of a gang member is in accordance with the law and supported by the kind of evidence allowing a factfinder to reasonably conclude that the defendant is guilty.

While Nye's testimony was at least somewhat relevant as evidence of defendant's aiding and abetting liability for the Tony Nguyen shooting and thus allowed as a matter of evidence law, it could not, as the majority concedes, serve as the sole evidence of guilt.  But neither, in my view, was Nye's testimony adequate to bridge the considerable evidentiary gaps left by the thin evidence of defendant's role in the Tony Nguyen shooting.  While Nye testified as to multiple concrete, specific actions a gang member might take to "back up" a fellow gang member in a confrontation — such as serving as the getaway driver, assaulting rival gang members, or taking over for the shooter — there is no evidence that defendant did or intended to do any of those things.  Instead, the *only* evidence of defendant's specific actions at the time of the shooting was that he "stared" at the

7

Cheap Boys car prior to the shooting. This indeterminate gesture was conceivably an example of defendant identifying the occupants of the car or attempting to intimidate them — both activities that Nye mentioned as examples of gang members acting as backup for one another — but it is at best equally consistent with a myriad of other inferences that would find such an action either innocent or inadvertent. To believe the factfinder could infer from this stare that defendant, beyond any reasonable doubt, aided Tony's shooting and intended his death is too great a leap for me to support.

And it remains too great a leap for me despite an admittedly demanding standard of review governing challenges to the sufficiency of the evidence. A reviewing court must view "the whole record in the light most favorable to the judgment" to determine whether it contains sufficient evidence "such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see *Jackson v. Virginia* (1979) 443 U.S. 307, 319 ["[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"].) But our strong presumption in favor of upholding factual determinations where reasonably possible in no way vitiates our responsibility to ensure that evidence sustaining a conviction is " ' "credible and of solid value," ' " (*People v. Hill* (1998) 17 Cal.4th 800, 848), and that inferences supporting a conviction are "of such substantiality that a reasonable trier of fact could determine beyond a reasonable doubt" that the inferred facts are true (*People v. Raley* (1992) 2 Cal.4th 870, 891). This case is replete with examples of criminal convictions supported by evidence meeting this standard, including defendant's conviction on two counts of murder and multiple counts of attempted premeditated murder, as well as active participation in the illicit activities of a criminal street gang. Not so with the

8

evidence surrounding the Tony Nguyen shooting.  On this count, the evidence most directly relevant was manifestly insufficient, on its own, to support defendant's conviction, while Nye's testimony — at least as it related to this count — was neither "credible" nor "of solid value" and thus could not substantially support the inference that defendant aided and abetted the attempted murder.

Which is why I respectfully dissent from the court's judgment upholding defendant's conviction for the attempted murder of Tony Nguyen.  In all other respects, I join the court's opinion.

CUÉLLAR, J.

9

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Nguyen

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S076340
**Date Filed:** August 13, 2015

_____

**Court:** Superior
**County:** Orange
**Judge:** Francisco Briseño

_____

**Counsel:**

Richard C. Neuhoff, under appointment by the Supreme Court, for Defendant and Appellant.

David Andreasen as Amicus Curiae on behalf of Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens, Garrett Beaumont and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Richard C. Neuhoff
11 Franklin Square
New Britain, CT  06051
(860) 229-0433

Christopher P. Beesley
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 645-2567